NAKAMOTO, J.
**198 In this employment action involving Oregon statutory retaliation claims, we decide whether the trial court erred by refusing to give an instruction regarding the "cat's paw" theory of establishing discriminatory or retaliatory motivation. After being terminated by defendant Nike, Inc., plaintiff Douglas Ossanna sued his former employer. Plaintiff alleged, among other things, that Nike had unlawfully fired him in retaliation for his safety complaints and for whistleblowing. Based on his theory that his supervisors held a retaliatory bias against him, plaintiff requested a "cat's paw" jury instruction informing the jury that, in considering his claims, it could impute a subordinate supervisor's biased retaliatory motive to Nike's formal decision-maker, an upper manager with firing authority, if the biased subordinate supervisor influenced, affected, or was involved in the decision to fire plaintiff. The trial court declined to give the instruction, and the jury returned a verdict for Nike. The Court of Appeals reversed, concluding that the trial court's refusal to give the requested "cat's paw" instruction was an instructional error that prejudiced plaintiff. Ossanna v. Nike, Inc. , 290 Or. App. 16, 415 P.3d 55 (2018).
We allowed Nike's petition for review to address the "cat's paw" doctrine under Oregon law and whether the trial court erred in refusing to give the proffered instruction. In deciding that question, we reach the following legal conclusions. We hold that the "cat's paw" doctrine is a viable theory in Oregon. The instruction on the doctrine in this case would have permitted the jury to impute the unlawful bias of a subordinate supervisor who lacked decision-making authority to the employer's authorized manager and ostensibly independent decision-maker, if the biased supervisor influenced or was involved in the adverse employment decision or decision-making process. For an employer to be liable, however, a plaintiff relying on the imputed-bias theory also must establish a causal connection between the supervisor's bias and the adverse employment action; the causation requirement for the claim at issue controls the degree of causation required to impose liability.
**199 We also conclude that the trial court erred in declining to give plaintiff's "cat's paw" jury instruction, because the instruction was a correct and applicable statement of the law, and that the instructional error prejudiced plaintiff. Accordingly, we affirm the decision of the Court of Appeals, reverse the judgment of the trial court as to plaintiff's retaliation claims, and remand the case to the trial court for further proceedings.
I. FACTUAL AND PROCEDURAL HISTORY
We review a trial court's failure to give a requested jury instruction for errors of law, State v. Reyes-Camarena , 330 Or. 431, 441, 7 P.3d 522 (2000), and evaluate the evidence in the light most favorable to the establishment of the facts necessary to require the instruction, Carter v. Mote , 285 Or. 275, 279, 590 P.2d 1214 (1979). We therefore *285 recite the facts in the light most favorable to the giving of plaintiff's "cat's paw" instruction.
From 2007 until his termination in 2013, plaintiff was a licensed electrician in Nike's maintenance department. In 2009, Nike established an electrician apprenticeship program so that participating employees could obtain a Limited Maintenance Electrician license. Portland Community College's (PCC) Metro Limited Maintenance Electrician Joint Apprenticeship Training Committee (JATC) administered the program. The program required an apprentice seeking licensure to log 4,000 hours of on-the-job training under the supervision of a licensed electrician and to take classes at PCC.
Between the 2009 inception of the apprenticeship program at Nike and 2012, plaintiff repeatedly voiced his concerns about the safety of apprentices performing unsupervised electrical work and about Nike's improper administration of the program in violation of JATC requirements. Initially, plaintiff spoke about his concerns with Dan Delgado, his direct supervisor and the person in charge of the apprenticeship program at Nike. But eventually, seeing no corrective measures, plaintiff escalated his concerns up Nike's chain of command. He communicated with-in ascending order of superiority-Mark Treppens, **200 maintenance operations manager; Nellie St. Jacques, facilities director; and Deb Hellmer-Steele, senior director of global corporate services. Plaintiff also conveyed his concerns to Stephanie Hammer, Nike's operational risk manager. Plaintiff raised concerns about the general mismanagement of the apprenticeship program and reported two specific electrocution incidents that had resulted from unsupervised apprentice work. Despite the reports, however, plaintiff did not observe any changes appropriately responsive to his concerns.
In December 2011, Nike had hired Treppens as its maintenance operations manager. Treppens supervised Delgado, plaintiff's direct supervisor. Soon after coming aboard, Treppens learned of plaintiff's safety concerns. In an email to himself, Treppens noted that an apprentice had reported overhearing plaintiff and another licensed electrician discuss filing a complaint with the Oregon Occupational Safety and Health Administration (OSHA). During a subsequent one-on-one meeting with plaintiff, Treppens informed plaintiff that he would not be considered for a supervisor opening "because of the past." Plaintiff understood Treppens to be referring to his past safety complaints. Plaintiff then shared the exchange with St. Jacques, prompting Treppens to call plaintiff into his office, where he denied having made the comment. Despite the foreshadowed outcome, plaintiff applied for the supervisor opening; he did not receive the promotion.
In February 2012, a resigning licensed electrician discussed his concerns about the apprenticeship program in an exit interview and mentioned that plaintiff shared those concerns. That prompted an employee relations manager to ask plaintiff about the safety concerns, which plaintiff confirmed. The resigning employee filed a safety complaint with JATC.
In May 2012, responding to that complaint, JATC conducted a site visit at the Nike campus to review the apprenticeship program. Shortly after, plaintiff reached out to Katrina Cloud, the JATC administrator, to express his safety concerns. That same month, plaintiff also filed a safety complaint with OSHA. Plaintiff remained in **201 communication with Cloud as JATC investigated Nike's compliance with the apprenticeship program criteria. At one point, Delgado called plaintiff into his office, locked the door, and warned plaintiff that, if he provided any information to JATC, he would not "be allowed on this campus again."
In late December 2012, the Nike campus was in "PowerDown" mode, during which time campus-related services were scaled back or shut down for the holidays. Plaintiff was not scheduled to work during PowerDown. But two contractors needing to complete a maintenance project at Nike's "Bo Jackson" sports facility contacted plaintiff about accessing the building. Plaintiff showed up with his all-access employee badge to let the contractors into the building. After reviewing the contractors' work, plaintiff suggested that they shoot baskets in the Bo *286 Jackson gym. The floor, they noticed, had recently been varnished, but they concluded that using the gym would not damage the floor. Plaintiff's son joined them, and the four shot baskets for 20 minutes or so.
In early January 2013, Delgado and Treppens interviewed plaintiff about using his access privilege at the Bo Jackson facility during PowerDown, implying that the gym floor had been damaged. Plaintiff acknowledged employing his access badge to allow unauthorized guests to use the gym but denied damaging the floor. Two days later, Treppens offered plaintiff the opportunity to resign in lieu of termination for abusing his access privilege. Plaintiff initially decided to resign. Later that same day, however, plaintiff rescinded his resignation, claiming that his termination was in retaliation for having raised prior safety and other concerns.
Plaintiff's claim of retaliation prompted Nike to "hit the pause button" on terminating his employment. Randi Miller, an employee relations manager, testified that she delayed issuing plaintiff's termination letter to gather more information about the retaliation allegation, including by interviewing plaintiff. Miller also testified that one of the first steps of the investigation was to exclude Treppens and Delgado-the accused retaliators-from the process. But despite that purported exclusion, at least Treppens **202 continued to communicate with Miller about the matter. St. Jacques-to whom Nike delegated firing authority-did not interview plaintiff; she largely relied on the information provided to her by Miller. In late January 2013, St. Jacques terminated plaintiff, citing abuse of his access privilege as the reason for the decision.
Subsequently, plaintiff initiated this action, asserting, inter alia , that Nike retaliated against him for making safety complaints, ORS 654.062(5), and for whistleblowing, ORS 659A.199. Plaintiff contended that, for roughly two years, Nike subjected him to a hostile work environment in which he was treated disrespectfully and with constant suspicion, managers and supervisors frequently made disparaging remarks about him, and he was required to attend a harassment class on pretextual allegations. Additionally, plaintiff alleged, Nike denied him a promotion and, ultimately, terminated his employment.
Plaintiff's claims were tried to a jury. Six days before trial, plaintiff requested that the trial court give a special jury instruction entitled "Imputation of Subordinate Bias." Plaintiff reasoned that, considering his theory of the case-that Delgado and Treppens had harbored a retaliatory bias against him and improperly influenced St. Jacques's ultimate decision to fire him-the "cat's paw" instruction informing the jury that it could impute Delgado's and Treppens's bias to St. Jacques was warranted.
At the pretrial conference on jury instructions, Nike stated that it did not object to the giving of an instruction similar to the one that plaintiff had provided, but it proposed certain revisions because it believed that plaintiff's instruction was incomplete. Later that day, Nike's counsel provided the court and plaintiff's counsel with a revised instruction, describing the revision "as approved by the Court this morning." That version of the instruction provided:
"Nike contends that Nellie St. Jacques was Nike's principal decision-maker regarding plaintiff's termination. You may impute to Ms. St. Jacques any biased retaliatory motive against [plaintiff] held by a subordinate of Ms. St. Jacques's at Nike, if you find that her adverse employment decision was not actually independent because a subordinate had a **203 biased retaliatory motive against [plaintiff] and that the same subordinate influenced, affected, or was involved in the adverse employment decision against [plaintiff]."
Yet despite its earlier stance, Nike objected to the instruction at the final conference on jury instructions that the court held on the day before closing arguments. The trial court, noting that Oregon appellate courts had not recognized the "cat's paw" doctrine under Oregon law, ultimately declined to give the instruction.[1] Instead, the trial court instructed *287 the jury on the elements of the retaliation claims-which included the requisite substantial-factor standard of causation-and on corporate agency. The trial court also told plaintiff that he could advocate for his subordinate-bias theory in closing argument. Without the requested instruction, plaintiff forewent making the argument in closing. The jury returned a defense verdict for Nike on both retaliation claims.
Plaintiff appealed from the resulting judgment, assigning error to the trial court's refusal to give the requested "cat's paw" instruction. The Court of Appeals agreed with plaintiff. In reaching its decision, the Court of Appeals first concluded that plaintiff's proposed instruction was a correct statement of the law. The court determined that the instruction was consistent with case law requiring a plaintiff asserting a statutory retaliation claim to prove that the biased motive was a "substantial factor" in causing the adverse employment action. Ossanna , 290 Or. App. at 27-28, 415 P.3d 55. Additionally, the Court of Appeals observed that it had adopted the "cat's paw" theory in two cases decided after the trial: La Manna v. City of Cornelius , 276 Or. App. 149, 366 P.3d 773 (2016), and LaCasse v. Owen , 278 Or. App. 24, 373 P.3d 1178 (2016). Those cases, the court explained, further supported its conclusion that plaintiff's "cat's paw" instruction was legally correct. Ossanna , 290 Or. App. at 29-32, 415 P.3d 55. Next, turning to the record, the Court of Appeals determined that plaintiff was entitled to the instruction because his pleadings encompassed the "cat's paw" theory and the evidence at trial supported giving the instruction. Id. at 33-36, 415 P.3d 55.
**204 The Court of Appeals determined that the trial court's error prejudiced plaintiff because the instructions that the trial court gave on causation and corporate agency did not encompass plaintiff's "cat's paw" theory of the case and, indeed, may have precluded the jury from considering it. Id. at 37-38, 415 P.3d 55. Accordingly, the Court of Appeals reversed and remanded the case as to the safety complaint retaliation and whistleblower retaliation claims. Nike petitioned this court for review.
II. ANALYSIS
On review, Nike does not contend that the "cat's paw" doctrine is incongruous with or unavailable under Oregon law. Rather, Nike argues that the trial court committed no error in refusing to give plaintiff's requested jury instruction, because that instruction incorrectly stated the law by eliminating the applicable standard of causation or by failing to relate the alleged retaliatory motive to plaintiff's protected activity. Alternatively, Nike contends that the "cat's paw" theory was inapplicable to this case and that any instructional error by the trial court was not so prejudicial as to warrant reversal. Before considering the merits of Nike's arguments, we address the availability under Oregon law of the "cat's paw" theory of establishing discriminatory or retaliatory motivation, a matter of first impression for this court.
A. "Cat's Paw" Under Oregon Law
Although this court has not addressed the "cat's paw" doctrine with respect to Oregon statutory employment claims, with its decision in this case, the Court of Appeals has now issued three decisions accepting and applying the theory in both statutory employment discrimination and retaliation cases. See also La Manna , 276 Or. App. 149, 366 P.3d 773 ; LaCasse , 278 Or. App. 24, 373 P.3d 1178. We agree with the Court of Appeals that the "cat's paw" doctrine is a viable theory for use in proving discriminatory or retaliatory motivation in Oregon statutory employment discrimination and retaliation cases.
Our analysis begins with an examination of federal "cat's paw" cases. Although federal precedent has no binding authority on this court's interpretation of state law, this court **205 has looked to Title VII precedent for guidance in analyzing claims brought under analogous provisions of ORS chapter 659A. PSU Association of University Professors v. PSU , 352 Or. 697, 711, 291 P.3d 658 (2012) (stating that "federal precedent interpreting the antidiscrimination provisions of Title VII can provide useful additional context to aid our analysis of the meaning of ORS 659A.030(1)(f)" (footnote omitted)); *288 Vaughn v. Pacific Northwest Bell Telephone , 289 Or. 73, 87, 611 P.2d 281 (1980) (recognizing similarity between statutory schemes in antidiscrimination provisions under ORS chapter 659, the precursor to ORS chapter 659A, and in Title VII). And a number of other Oregon statutes prohibiting employment discrimination expressly require that they be construed in a manner that is consistent with analogous federal statutes. See ORS 659A.139(1) (requiring that state provisions prohibiting unlawful discrimination against persons with disabilities "be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990"); ORS 659A.186(2) (similarly requiring consistent construction between Oregon Family Leave Act and the federal Family and Medical Leave Act of 1993). In this case, part of plaintiff's action pertained to Nike's alleged violation of ORS 654.062(5) in the Oregon Safe Employment Act (OSEA).[2] That provision-which makes it an unlawful employment practice for any person to "discharge from employment or otherwise discriminate against any employee" who has "[m]ade any complaint * * * under or related to" the OSEA-has a federal counterpart in the Occupational Safety and Health Act. Under 29 USC section 660(c)(1), "[n]o person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint * * * under or related to this Act." Federal courts have adopted the same mode of analysis used in a wide variety of federal employment retaliation claims, including Title VII cases, **206 for retaliation cases brought under 29 USC section 660(c)(1). See, e.g. , Reich v. Hoy Shoe Co., Inc. , 32 F.3d 361, 365 (8th Cir. 1994). In light of the same requirement for a plaintiff to prove discriminatory or retaliatory animus in both state and federal claims, an examination of the "cat's paw" theory under federal jurisprudence concerning statutes prohibiting discriminatory or retaliatory employment actions is instructive to our consideration of that theory's viability under similar Oregon statutes prohibiting discrimination and retaliation in employment. We begin with federal precedent because the "cat's paw" theory originated in federal court.
The term "cat's paw" derives from an Aesop's fable popularized by Jean de La Fontaine about a monkey who induces an unwitting cat to pull roasting chestnuts from the fire. Staub v. Proctor Hospital , 562 U.S. 411, 415 n. 1, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). As the cat extracts the chestnuts, the monkey consumes them, leaving the cat with nothing but burnt paws. Id. In the general lexicon, "cat's paw" has come to refer to "one used by another to accomplish [the other's] purposes." Webster's Third New Int'l Dictionary 354 (unabridged ed. 2002). Judge Posner imported the "cat's paw" doctrine into the employment law context in 1990 when he used the term to describe a neutral decision-maker acting as the "conduit" of a non-decision-maker's prejudice in violation of the Age Discrimination in Employment Act of 1967. Shager v. Upjohn Co. , 913 F.2d 398, 405 (7th Cir. 1990).
In Shager , a supervisor who lacked decision-making authority recommended-allegedly due to age-based animus-that the committee with actual decision-making authority fire the plaintiff, and the committee acted on the tainted recommendation. Id. Writing for the Seventh Circuit Court of Appeals, Judge Posner declared that the employer could not escape liability by relying on the decision-making committee's lack of bias if the committee acted as the biased supervisor's "conduit" or "cat's paw" without conducting an independent investigation. Id. The Shager court based its reasoning on agency principles: "[A] supervisory employee who fires a subordinate is doing the kind of thing that he is authorized to do, and the wrongful intent with which he does it does not carry his behavior so far beyond the orbit **207 of his responsibilities as to excuse the employer." Id. (citing *289 Restatement (Second) of Agency § 228 (1958) ). The court added, however, that the concern is "with confining the employer's or principal's liability to the general class of cases in which he has the practical ability to head off the injury to his employee's, or other agent's, victim." Id.
Since Shager , all the other federal circuit courts of appeals have also adopted the "cat's paw" theory of imputed bias (although, in some instances, not the feline moniker) in employment discrimination and retaliation actions brought under a variety of federal statutes.[3] The federal courts, however, articulated the theory in almost as many ways as cats have lives; they often invoked the theory using recurring terminology but described it without regular consistency. See, e.g. , E.E.O.C. v. BCI Coca-Cola Bottling Co. , 450 F.3d 476 (10th Cir. 2006), cert. dismissed , 549 U.S. 1334, 127 S.Ct. 1931, 167 L.Ed.2d 583 (2007) (discussing that its sister circuits have divided over a "lenient" versus "strict" approach to the "cat's paw" theory, before formulating an intermediate standard for itself).
In 2011, the United States Supreme Court finally joined the lower federal courts in adopting the "cat's paw" theory and clarified the kind of proof required for a plaintiff to present the theory to the factfinder. Staub , 562 U.S. at 411, 131 S.Ct. 1186, 179 L.Ed.2d 144. The plaintiff in Staub claimed that his immediate supervisor and second-level supervisor were hostile toward and discriminated against him because of his military service obligations, in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA). Id. at 415, 131 S. Ct. 1186. The decision to fire the plaintiff, however, was made by a human resources vice president who had firing authority, **208 in reliance on a report from the second-level supervisor. Id. at 414-15, 131 S. Ct. 1186. In rejecting the employer's argument that an "employer is not liable unless the de facto decisionmaker * * * is motivated by discriminatory animus[,]" the Court recognized the "cat's paw" doctrine as a viable theory in employment discrimination cases. Id. at 419-20, 131 S. Ct. 1186. The Court explained that "an employer's mere conduct of an independent investigation" that does not sever the causal link between the biased motive of the supervisor and the employment decision will not "relieve[ ] the employer of 'fault.' " Id. at 421, 131 S. Ct. 1186. The Court "express[ed] no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." Id. at 422 n. 4, 131 S. Ct. 1186.[4]
Since the Staub decision, the intermediate federal appellate courts have developed the "cat's paw" theory by explaining that the applicable standard of causation in an employment discrimination or retaliation case involving use of the theory depends on the law governing the claims at issue. In *290 Zamora v. City of Houston , 798 F.3d 326 (5th Cir. 2015), cert. den. , City of Houston v. Zamora , --- U.S. ----, 136 S. Ct. 2009, 195 L.Ed.2d 215 (2016), for example, the Fifth Circuit addressed as a matter of first impression how the "cat's paw" analysis in Staub (a USERRA discrimination case) applies, if at all, in the Title VII retaliation context. The Fifth Circuit held that the "cat's paw" doctrine remains a viable theory but explained that Staub 's motivating-factor standard of causation needed to be replaced with the "but-for" standard of causation that applies to a Title VII retaliation claim. Id. at 331-33. See also **209 Lockheed Martin Corp. v. Administrative Review Bd. , 717 F.3d 1121, 1137 (10th Cir. 2013) (tailoring "cat's paw" theory to retaliation claim brought under Sarbanes-Oxley Act by requiring the less onerous contributing-factor causation); Sims v. MVM, Inc. , 704 F.3d 1327, 1335-36 (11th Cir. 2013) (modifying theory in ADEA case to require but-for causation).
As that overview reflects, the "cat's paw" doctrine is widely accepted as a viable theory in employment discrimination and retaliation cases for imputing bias to a manager with decision-making authority, and we join the above-mentioned courts in adopting it. With the "cat's paw" theory, a plaintiff is able to explain why an employer's theoretically neutral decision-maker does not insulate the employer from liability for an adverse employment decision that, in actuality, is based upon biased information or recommendations provided by biased supervisors. We hold that, in Oregon statutory employment discrimination and retaliation cases, a plaintiff may assert the "cat's paw" theory to impute the bias of a supervisor who lacks decision-making authority to the employer's manager and ultimate decision-maker, if the plaintiff can point to evidence that the non-decision-maker influenced or was involved in the adverse employment decision. Because the allegedly biased individuals in this case were plaintiff's immediate and second-level supervisors, who lacked firing authority, our holding addresses the imputation of the bias of a subordinate supervisor to an upper manager who served as the decision-maker, and we need not and do not express an opinion regarding whether the "cat's paw" theory under Oregon law extends to imputing the bias of others to the decision-maker.
The "cat's paw" theory as we adopt it does not prescribe a particular level of control that a biased employee-in this case, a subordinate supervisor-must exert over the employment decision (e.g. , that the employee must have reported the plaintiff or must have recommended the decision) before allowing the bias to be imputed to the decision-maker. We agree with the federal courts of appeals that have held that a biased supervisor's influence on or involvement in the decision or decision-making process is sufficient to allow a factfinder to impute bias. See Poland v. Chertoff , 494 F.3d 1174, 1182-83 (9th Cir. 2007) (collecting cases for **210 proposition that a subordinate employee's retaliatory bias can be imputed to the employer if the plaintiff proves that the biased subordinate "influenced or was involved in" the decision or decision-making process). That approach is practical, considering a workplace reality: The employment setting often consists of multiple layers of networks and relationships; organizational models often do not reflect a simple vertical chain of command; and bias can enter the decision-making process through formal or less formal channels. See BCI , 450 F.3d at 486 ("It should go without saying that a company's organizational chart does not always accurately reflect its decisionmaking process.").
Thus, so long as a plaintiff can show that a biased supervisor influenced or was involved in the adverse employment decision, the plaintiff may establish the employer's unlawful bias based on the "cat's paw" theory. To require more-that, as a matter of law, a plaintiff must satisfy a preliminary causal threshold by showing that the biased supervisor influenced or was involved in the decision to a prespecified degree-would be to remove questions of fact from the jury. Requiring, as an initial matter, that there be certain acts to trigger imputation would artificially limit the circumstances to which the "cat's paw" theory might apply, based on preconceived notions of the ways in which unlawful animus manifests.
*291 But imputation of bias works only to permit a factfinder to impute a supervisor's bias to a defendant employer. To prove the employer's liability for an unlawful employment practice, a plaintiff must also demonstrate the requisite causation-that the supervisor's unlawful bias caused the adverse employment action. As the federal courts have noted, the "cat's paw" theory does not displace the requirement that a plaintiff establish a causal nexus between the bias of the supervisor and the ultimate adverse employment action. See, e.g. , Zamora , 798 F.3d at 332 (distinguishing causation standard for proving a Title VII retaliation claim from "whether a supervisor's unlawful animus may be imputed to the decisionmaker"). The "cat's paw" theory provides only a pathway for satisfying the causation requirement of an employment discrimination or retaliation claim; it does not replace or eliminate the causation requirement **211 itself. An employer ultimately will be held liable only if the factfinder determines that the requisite causal connection exists between the supervisor's bias and the adverse employment action. As for the requisite level of causation, we join the federal circuit courts that have recognized that the plaintiff's required showing will vary depending upon the particular causal connection that the substantive law requires. See Zamora , 798 F.3d at 331-33 ; Lockheed Martin Corp. , 717 F.3d at 1137 ; Sims , 704 F.3d at 1335-36.
Finally, we agree with the Supreme Court that an employer's independent investigation, if it "results in an adverse action for reasons unrelated to the supervisor's original biased action," could absolve the employer of liability. Staub , 562 U.S. at 421, 131 S.Ct. 1186. But a perfunctory or performative "independent" investigation will not suffice; an employer may still remain liable if the plaintiff can establish that the supervisor's bias caused the adverse action by the decision-maker. Were it otherwise, employers would be able to avoid liability on mere technicality by going through the motions of conducting an investigation.
The Court of Appeals' earlier treatment of the "cat's paw" theory, in two cases on appeal from summary judgments for the defendants, is consistent with the rule that we adopt. The issue before the Court of Appeals in each case, and the only one that it addressed, was whether the facts engaged the "cat's paw" theory such that the theory was available to the plaintiff. In La Manna , the plaintiff, a 50-year-old gay man, sued the employer city government for age and sexual-orientation discrimination under various federal and state laws after the city manager pressured him to withdraw his job application. 276 Or. App. at 151-53, 366 P.3d 773. The plaintiff contended that the city manager had acted on information traceable to an officer who had commented on the plaintiff's age during the job interview, which served as evidence of age discrimination. Id. at 152, 154, 366 P.3d 773.
The Court of Appeals agreed with the plaintiff, relying on a Ninth Circuit decision for the proposition that, "even in a case involving an 'independent decision-maker,' conduct of a biased subordinate can prove pretext if 'the biased subordinate influenced or was involved in the decision **212 or decision-making process.' " La Manna , 276 Or. App. at 160, 366 P.3d 773 (citing Poland , 494 F.3d at 1182 ). The Court of Appeals determined that the officer's comments "contribute to an inference that the [city manager's] decision to require plaintiff to withdraw was based on his age." Id. Similarly, as to the sexual-orientation discrimination claim, the court stated that the "plaintiff is not required to show that the person who made the [adverse employment] decision had the protected characteristic in mind if that person or the decision-making process was influenced by a subordinate who was biased against the plaintiff because of the protected characteristic." Id. at 165-66, 366 P.3d 773. See also LaCasse , 278 Or. App. at 37, 373 P.3d 1178 (stating, in a sexual harassment retaliation case, that "a trier of fact could conclude that [the decision-maker's] decision was influenced by * * * an improperly motivated subordinate" (citing La Manna )).
B. Application to This Case
Having established that a plaintiff may advance the "cat's paw" theory of imputed bias under Oregon statutory retaliation *292 claims, we turn to whether the trial court erred in refusing to give plaintiff's requested "cat's paw" instruction in this case. Nike contends that plaintiff was not entitled to the "cat's paw" instruction that he requested because the instruction misstated the law. Alternatively, Nike argues, the instruction would have been superfluous, because that theory was already subsumed within the jury instructions that the trial court did give on substantial-factor causation and corporate agency.[5] Finally, Nike posits that, even if the court erred, the error was not so prejudicial as to warrant a reversal.
1. Whether the trial court erred in refusing to give the jury instruction
As a general matter, a party is entitled to a jury instruction on its theory of the case if the requested instruction correctly states the law, is based on the operative pleadings, and is supported by the evidence.
**213 Hernandez v. Barbo Machinery Co. , 327 Or. 99, 106, 957 P.2d 147 (1998). "A trial court, however, is not required to give a requested instruction if another instruction adequately addresses the issue." State v. Ashkins , 357 Or. 642, 648, 357 P.3d 490 (2015) (citation omitted).
First, Nike advances two arguments in support of its contention that plaintiff's "cat's paw" instruction incorrectly stated the law. Again, that instruction provided:
"Nike contends that Nellie St. Jacques was Nike's principal decision-maker regarding plaintiff's termination. You may impute to Ms. St. Jacques any biased retaliatory motive against [plaintiff] held by a subordinate of Ms. St. Jacques's at Nike, if you find that her adverse employment decision was not actually independent because a subordinate had a biased retaliatory motive against [plaintiff] and that the same subordinate influenced, affected, or was involved in the adverse employment decision against [plaintiff]."
We conclude that the proposed "cat's paw" instruction was a correct statement of the law.
Nike initially contends that the instruction effectively eliminates the burden on plaintiff to meet the causation requirement applicable to the retaliation claims he brought. Plaintiff alleged that Nike violated the statute prohibiting retaliation against employees for making certain safety-related complaints, ORS 654.062(5), which provides:
"It is an unlawful employment practice for any person to bar or discharge from employment or otherwise discriminate against any employee * * * because the employee * * * has:
"(a) Opposed any practice forbidden by ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780 ;
"(b) Made any complaint or instituted or caused to be instituted any proceeding under or related to ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780, or has testified or is about to testify in any such proceeding; or
"(c) Exercised on behalf of the employee, prospective employee or others any rights afforded by ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780."
**214 (Emphasis added.) Plaintiff also alleged that Nike violated the statute prohibiting retaliation for whistleblowing, ORS 659A.199(1), which provides:
"It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."
(Emphasis added.) The parties agree that the emphasized statutory texts impose upon plaintiff the same causation requirement that the Court of Appeals has recognized as applying in an employment retaliation claim: the substantial-factor standard of causation. See, e.g. , *293 Estes v. Lewis and Clark College , 152 Or. App. 372, 381, 954 P.2d 792, rev. den. , 327 Or. 583, 971 P.2d 411 (1998).
Nike argues that the "influenced, affected, or was involved" wording of plaintiff's proposed instruction would have incorrectly suggested to the jury that it could find bias in the decision-making if one of the subordinates had any role in the termination decision, irrespective of the substantial-factor standard of causation.[6] According to Nike, plaintiff's proposed instruction, therefore, would have allowed the jury to find Nike liable by imputing Delgado's or Treppens' alleged bias to St. Jacques without also finding that bias was a "substantial factor" in St. Jacques's decision to terminate plaintiff. Reviewing a sampling of "cat's paw" instructions in other jurisdictions, Nike contends that a proper instruction would have clarified for the jury that a two-step inquiry is required and that a plaintiff in a case like this one must prove both (1) a biased intent to cause an adverse employment action and (2) the requisite causal element.
**215 We agree that a plaintiff must prove both of those elements, but Nike misreads the proposed "cat's paw" instruction as relieving plaintiff from his burden to prove causation. The "influenced, affected, or was involved in" wording of the instruction-which Nike faults as lowering the standard of causation-does not purport to displace the applicable substantial-factor standard of causation, about which the jury was separately instructed. The proposed instruction informs the jury that it may impute a subordinate's bias to the decision-maker if the subordinate influenced, affected, or was involved in the employment decision. But if the jury had been instructed that it could impute that bias, it still had to consider whether the bias, or the act of the person with that bias, was a substantial factor in the termination pursuant to the trial court's other instructions.
In that regard, the trial court gave the jury two instructions concerning the elements of the retaliation claims that required plaintiff to prove causation to recover. The jury instruction regarding the safety-complaint retaliation claim stated, in relevant part:
"To recover on this claim, [plaintiff] must prove by a preponderance of the evidence:
"* * * * *
"(2) [Defendant] discharged, demoted, suspended, refused to promote, discriminated, or retaliated against [plaintiff] regarding any term, condition, or privilege of employment; and [plaintiff] reporting the information was a substantial factor in [defendant's] decision. A substantial factor is a factor that made a difference ."
(Emphasis added.) The jury instruction regarding the whistleblower retaliation claim stated the identical causation requirement:
"To recover on this claim, [plaintiff] must prove by a preponderance of the evidence:
"* * * * *
"(3) [Defendant] discharged, demoted, suspended, refused to promote, discriminated, or retaliated against [plaintiff] regarding any term, condition, or privilege of employment; and [plaintiff] reporting the information was **216 a substantial factor in [defendant's] decision. A substantial factor is a factor that made a difference ."
(Emphasis added.) It would have been possible for the jury to decide that the decision-maker had an imputed retaliatory motive under the imputed-bias instruction but that the retaliatory motive was not a substantial factor in the adverse employment action under the instruction on the causation element of each retaliation claim. Thus, viewed in combination with the other jury instructions, plaintiff's proposed "cat's paw" instruction did not misstate the law by eliminating the substantial-factor causation requirement.
Second, Nike argues that plaintiff's proposed instruction was incorrect because it *294 referred generally to a biased retaliatory motive without relating that motive in any way to protected activity engaged in by plaintiff. But the protected activity-plaintiff's safety complaints and whistleblowing-is discernible from the context of the case. Plaintiff alleged that he had reported information about workplace conduct that he believed to be in violation of the law and, consequently, was discharged, denied promotion, and subjected to a hostile work environment in retaliation for his actions. The jury also was instructed that plaintiff was required to prove those allegations by a preponderance of the evidence. Considering that context and the absence of any other alleged basis for bias in this case, the jury would have correctly understood the proposed instruction to concern retaliatory bias motivated by plaintiff's safety complaints and whistleblowing. Thus, we reject Nike's arguments that the instruction was legally incorrect.
In addition to its argument that the jury instruction was an incorrect statement of the law, Nike contends that the jury instruction was inapplicable to this case based on the record. Specifically, Nike argues that the circumstances of this case did not present a "cat's paw" scenario because (1) St. Jacques was not an unwitting decision-maker who was manipulated by her biased subordinates, Delgado or Treppens, and (2) the underlying reason for plaintiff's termination was the incident at the Bo Jackson facility, which was not triggered by Delgado or Treppens. We are unconvinced, **217 because Nike's view of the facts developed at trial favors its theory of the case rather than plaintiff's theory of the case and the facts supporting it.
"It is well supported by authority that in presenting the law of a case to the jury the court must instruct on the law applicable to all theories of the case that are supported by any competent evidence." Carter , 285 Or. at 279, 590 P.2d 1214 (citation and quotation marks omitted). Here, plaintiff's "cat's paw" theory is adequately supported by the evidence in the record. Cloud, the JATC administrator, testified that Delgado was directed by upper management to make the JATC investigation "go away." Plaintiff testified that both Delgado and Treppens had made remarks to the effect that his employment prospects at Nike were correlated with his expressed views on safety issues related to the apprenticeship program. For example, plaintiff testified that Delgado told him, "If you or Oregon Electric were to provide any information to the PCC Committee, you will not be allowed on this campus again." Plaintiff also introduced evidence that Treppens had documented plaintiff's intention to file a safety complaint with OSHA. The evidence supported the inference that Delgado and Treppens were motivated to retaliate against plaintiff for his safety complaints.
Additionally, the evidence in the record allowed the jury to infer that St. Jacques's decision to terminate plaintiff was influenced by Treppens or Delgado. St. Jacques effectively delegated full responsibility to Miller to conduct the investigation into plaintiff's retaliation allegations. Miller, for her part, received information directly from Treppens. Based on this record, plaintiff demonstrated the requisite influence or involvement for the giving of the "cat's paw" jury instruction.
Lastly, Nike contends that the "cat's paw" instruction was superfluous, considering instructions that the trial court gave on the substantial-factor standard of causation and on corporate agency. "A trial court * * * is not required to give a requested instruction if another instruction adequately addresses the issue." Ashkins , 357 Or. at 648, 357 P.3d 490 (citation omitted). As did the Court of Appeals, we reject Nike's argument.
**218 The substantial-factor instruction was subsumed into the instructions on the substantive elements of plaintiff's retaliation claims, which provided, in part:
"Nike discharged, demoted, suspended, refused to promote, discriminated, or retaliated against [plaintiff] regarding any term, condition, or privilege of employment; and [plaintiff] reporting the information was a substantial factor in Nike's decision. A substantial factor is a factor that made a difference."
The corporate agency instruction read:
"A corporation can act only through its officers, agents, or employees. Any action by an officer or employee of the corporation *295 is the act of that corporation if the act was within the scope of that person's authority and/or employment."
The substantial-factor instruction explained only the applicable standard of causation; it did not inform the jury, in any respect, regarding whose retaliatory motive it might consider. And the corporate agency instruction linked Nike, the corporation, to officers or employees acting within their scope of authority or employment. Here, Nike asserted at trial that St. Jacques was the sole decision-maker-that is, she was its sole agent authorized to make the termination decision. The corporate agency instruction, therefore, suggested that Nike was liable for St. Jacques's termination decision. But nothing in the instruction informed the jury that it could impute her subordinate's bias to her. Neither instruction served the function that the "cat's paw" instruction would have-to inform the jury that it could impute Delgado's and Treppens' retaliatory motive to St. Jacques, even if St. Jacques herself did not harbor unlawful animus toward plaintiff.
To summarize, plaintiff's "cat's paw" instruction was a correct statement of the law; the evidence in the record supported the giving of a "cat's paw" instruction; and the "cat's paw" instruction was not rendered unnecessary by the trial court's delivery of jury instructions on substantial-factor causation and corporate agency. Therefore, plaintiff was entitled to his requested instruction, and the trial court erred in declining to give it.
**219 2. Whether the error substantially affected plaintiff's rights
Because the trial court erred in declining to give the "cat's paw" instruction, we next consider whether the error is reversible. See ORS 19.415(2) ("No judgment shall be reversed or modified except for error substantially affecting the rights of a party."); see also Or. Const, Art VII (Amended), § 3. In making that determination, we must consider the instruction as a whole "in the context of the evidence at trial and the parties' theories of the case with respect to the various charges, claims, and defenses" at issue. Purdy v. Deere and Company , 355 Or. 204, 227-28, 324 P.3d 455 (2014) (citation omitted). An error in failing to give a proposed instruction is harmless if there is "little likelihood that the error affected the verdict." Ashkins , 357 Or. at 660, 357 P.3d 490 (citation and quotation marks omitted). Conversely, the error is prejudicial if the absence of the jury instruction "probably created an erroneous impression of the law" in the minds of the jury and "if that erroneous impression may have affected the outcome of the case." Hernandez , 327 Or. at 106-07, 957 P.2d 147 (citations omitted).
Nike argues that no prejudicial error exists that warrants reversal. That lack of prejudice, Nike posits, is demonstrated by the jury's rejection of plaintiff's other claims. Aside from alleging that his termination constituted an unlawful adverse employment action, plaintiff claimed that Nike had wrongfully denied him a promotion because of his safety reports and that Delgado and Treppens had subjected him to a hostile work environment by treating him disrespectfully and with constant suspicion, frequently making disparaging remarks about him, assigning him undesirable tasks and schedules, falsely accusing him of behavioral and performance issues, and requiring him to attend a harassment class on those false accusations. In essence, Nike asserts that there was "no harm, no foul," because a jury that did not find for plaintiff on his theories of direct causation (linking Treppens's or Delgado's retaliatory animus directly to an adverse employment action) would not have found for plaintiff on his indirect, "cat's paw" theory (linking Treppens's or Delgado's retaliatory animus **220 indirectly to an adverse employment action via the decision-making of St. Jacques).
But plaintiff's inability to establish his failure-to-promote and hostile-work-environment claims does not necessarily mean that he would have been unable to succeed on his termination claim. Because the jury was not asked to specify its findings on the various allegations and could have rejected plaintiff's failure-to-promote and hostile-work-environment claims for reasons other than that it disbelieved that Delgado or Treppens intended to retaliate against plaintiff (e.g. , by *296 concluding that the person promoted had qualifications superior to plaintiff's or that the alleged harassing conduct did not create a hostile work environment), we cannot conclude that a "cat's paw" instruction was unlikely to have affected the jury's verdict concerning the reason for Nike's termination of plaintiff's employment.
Conversely, in view of the arguments that plaintiff advanced at trial, the testimony that he elicited, and the evidence that he presented, the record supports our conclusion that the trial court's failure to give the requested "cat's paw" instruction was not harmless. Plaintiff's opening argument focused largely on highlighting the actions and retaliatory motivations of Delgado and Treppens; in contrast, St. Jacques featured limitedly, and primarily, only as the ultimate decision-maker in a process in which she was otherwise uninvolved. The witness examinations of plaintiff and St. Jacques further demonstrated plaintiff's intention to deconstruct Nike's argument that St. Jacques was an independent decision-maker; both witnesses testified that St. Jacques never interviewed plaintiff regarding the Bo Jackson incident. Plaintiff also introduced evidence of communications between Treppens and Miller during the investigation into plaintiff's retaliation allegations to demonstrate Treppens' influence on the decision-making process.
Nike's theory of the case further demonstrates the prejudicial nature of the trial court's refusal to give plaintiff's "cat's paw" instruction. In stark contrast to plaintiff's limited mention of St. Jacques in his opening argument, Nike placed emphasis on St. Jacques as the key player in the **221 termination decision. At various points during trial, and in its briefing to this court, Nike represented that St. Jacques was the "sole" or "ultimate" decision-maker. And, taking advantage of the absence of the "cat's paw" instruction, Nike argued to the jury in closing that "[t]he only permissible question is whether or not the termination decision was improperly motivated by a desire to retaliate against [plaintiff], and there is no evidence that Nellie St. Jacques ever had that motivation ." Illustrative of Nike's overall presentation of its case, the argument posited that the only person whose motivation mattered was St. Jacques. In the absence of the "cat's paw" instruction, the jury had no way of knowing that it could impute a subordinate supervisor's bias to St. Jacques and thereby find for plaintiff on the retaliation claims.
Finally, Nike contends that plaintiff abandoned his right to claim prejudice when he declined to argue the "cat's paw" theory in closing, despite the trial court's statement that the plaintiff could do so. But arguments put forth by an interested party are not adequate surrogates for controlling jury instructions given by the court; jury instructions matter. Whereas the jury may accept or disregard any argument made by a party, the jury must abide by the instructions of the court, a neutral authority. Therefore, even if plaintiff had argued the "cat's paw" theory, there was nothing preventing the jury from rejecting it as a concept. That is not so with jury instructions. A trial court's delivery of jury instructions signifies to the jury what laws are applicable in the case. It is understandable that plaintiff did not argue a theory that was not supported by the trial court's instructions, and plaintiff did not waive or abandon the legal argument that the trial court did not accept.
III. CONCLUSION
In sum, under Oregon law, a plaintiff asserting a statutory employment discrimination or retaliation claim may advance a "cat's paw" theory and impute the bias of a supervisor non-decision-maker to the ultimate decision-maker if the non-decision-maker influenced or was involved in the adverse employment decision. However, an employer is not liable unless a causal connection exists between the **222 subordinate's bias and the adverse employment action. In this case, the trial court erred by refusing to give plaintiff's "cat's paw" instruction, which was a correct and applicable statement of the law, and that error prejudiced plaintiff.
The decision of the Court of Appeals is affirmed. The judgment of the circuit court on plaintiff's claims for safety complaint retaliation and whistleblower retaliation is reversed, *297 and the case is remanded to the circuit court for further proceedings.

As further discussed below, the Court of Appeals later adopted the "cat's paw" theory in two 2016 decisions.

The OSEA, codified in ORS 654.001 to 654.295, ORS 654.412 to 654.423, ORS 654.750 to 654.780, and ORS 654.991, provides that the Bureau of Labor and Industries shall process a complaint alleging retaliation "under the procedures, policies and remedies established by ORS chapter 659A and * * * in the same way and to the same extent that the complaint would be processed if the complaint involved allegations of unlawful employment practices under ORS 659A.030 (1)(f)." ORS 654.062(6)(a).

See, e.g. , Vasquez v. Empress Ambulance Service, Inc. , 835 F.3d 267, 272-73 (2d Cir. 2016) ; Poland v. Chertoff , 494 F.3d 1174, 1182 (9th Cir. 2007) ; E.E.O.C. v. BCI Coca-Cola Bottling Co. , 450 F.3d 476, 487 (10th Cir. 2006), cert. dismissed , 549 U.S. 1334, 127 S.Ct. 1931, 167 L.Ed.2d 583 (2007) ; Hill v. Lockheed Martin Logistics Mgmt. , 354 F.3d 277, 290-91 (4th Cir. 2004), cert. dismissed , 543 U.S. 1132, 125 S.Ct. 1115, 160 L.Ed.2d 1090 (2005) ; Stimpson v. City of Tuscaloosa , 186 F.3d 1328, 1332 (11th Cir. 1999), cert. dismissed , 529 U.S. 1053, 120 S.Ct. 1555, 146 L.Ed.2d 460 (2000) ; Ercegovich v. Goodyear Tire & Rubber Co. , 154 F.3d 344, 354-55 (6th Cir. 1998) ; Griffin v. Washington Convention Center , 142 F.3d 1308, 1312-13 (D.C. Cir. 1998) ; Mulero-Rodríguez v. Ponte, Inc. , 98 F.3d 670, 675-76 (1st Cir. 1996) ; Long v. Eastfield College , 88 F.3d 300, 307 (5th Cir. 1996) ; Abrams v. Lightolier Inc. , 50 F.3d 1204, 1214 (3d Cir. 1995) ; Stacks v. Southwestern Bell Yellow Pages, Inc. , 27 F.3d 1316, 1323 (8th Cir. 1994).

Since then, at least two federal courts of appeals have addressed whether the "cat's paw" theory applies if a coworker, rather than a supervisor, harbored the unlawful animus that influenced the ultimate employment decision. The First Circuit answered that question in the affirmative in a Title VII sex discrimination case, but the court added an "employer negligence" criterion. Velázquez v. Developers Diversified Realty , 753 F.3d 265, 274 (1st Cir. 2014) (An employer may be liable if "the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation."). See also Vasquez , 835 F.3d at 276 ("[A]n employer may be held liable for an employee's animus under a 'cat's paw' theory, regardless of the employee's role within the organization, if the employer's own negligence gives effect to the employee's animus and causes the victim to suffer an adverse employment action.").

Except to the extent that it argues that the corporate agency instruction renders the "cat's paw" instruction superfluous, Nike does not make any arguments based on agency principles.

Plaintiff urges this court to dismiss Nike's argument on whether the instruction was legally correct, contending that Nike failed to preserve it. However, to the extent that plaintiff's understanding of Nike's arguments in the trial court is correct, under the "right for the wrong reason" doctrine, Nike could make that alternative legal argument for affirmance for the first time in the Court of Appeals. See Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) (discussing "right for the wrong reason" doctrine).