Argued and submitted June 2, 2004, judgment on state and federal retaliation claims reversed and remanded; otherwise affirmed February 2, 2005

## Cindy BOYNTON-BURNS,
*Appellant,*

*v.*

## UNIVERSITY OF OREGON,
*Respondent.*

16-00-16053; A118443

105 P3d 893

374

David C. Force argued the cause and filed the briefs for appellant.

Richard D. Wasserman, Attorney-in-Charge, Civil/Administrative Appeals Unit, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Plaintiff claims that defendant University of Oregon (the university) discriminated against her on the basis of sex and retaliated against her for opposing its allegedly discriminatory practices. At the close of plaintiff's case, the university moved for a directed verdict and involuntary dismissal, both of which the trial court granted. We affirm the involuntary dismissal of plaintiff's discrimination claims, but reverse the directed verdict and involuntary dismissal of plaintiff's federal and state retaliation claims.

Because the trial court dismissed plaintiff's claims before the university presented its case, only plaintiff's account of the events at issue was adduced at trial. Her testimony revealed the following. The university hired plaintiff as an apprentice journeyman electrician. It paid her a regular salary, provided her with training and on-the-job experience as an electrician, and reported her progress to the Joint Apprenticeship and Training Committee (JATC), which oversaw her apprenticeship. The goal of the apprenticeship was for plaintiff to obtain a certificate of completion and journeyman-level status as an electrician.

Shortly after she started work, plaintiff began having problems with her immediate supervisor, Springer. One of Springer's jobs was to sign progress reports and send them to JATC at the beginning of every month. Springer, however, consistently refused to sign the reports in a timely fashion. At first, he simply ignored plaintiff's reminders that the reports were due. Then, he began giving her trouble about the way that she filled out the reports: he forced her to redo them repeatedly; he demanded confirmation from JATC that plaintiff was filling them out properly; he was unsatisfied with the confirmation that he received and persisted in his refusal to sign the reports. JATC responded to the problem by instructing plaintiff to tell Springer that he should no longer sign the reports, to which he responded angrily.

Over the next four years, plaintiff and Springer continued to have problems. Springer denied plaintiff's request to alter her schedule to come into the shop 10 minutes late and leave 10 minutes late so that she could drop off her child

at school. On numerous occasions, Springer yelled at and berated plaintiff without just cause. Springer refused to let plaintiff perform "real work" and assigned her to prolonged "light bulb duty," which consists of handing light bulbs to the other electricians. Springer also jeopardized plaintiff's apprenticeship by failing to turn in a wage statement survey to JATC. The university nearly lost its training status—and plaintiff her apprenticeship—because of that failure. Springer's secretary told plaintiff that she thought that Springer had thrown away the survey. Finally, Springer forced plaintiff to quit her position on a workplace safety committee because he felt that plaintiff "shouldn't be telling his journeymen what to do safety-wise."

Several incidents led plaintiff to believe that Springer might have been discriminating against her on the basis of sex. Plaintiff was the only female in the shop, and Springer treated her differently from all of the other people there. For example, Springer allowed one of the men to alter his schedule to accommodate his child care needs but refused to similarly accommodate plaintiff. Additionally, when plaintiff started having problems with Springer, she talked about the problems with someone in the human resources department, who told her that the affirmative action office had "pushed real hard" for Springer to hire her. Additionally, Springer's own comments—including a comment that attributed plaintiff's work-related complaints to her being "overemotional, like his wife and daughter"—indicated to plaintiff that Springer was discriminating against her on the basis of sex.

During the years that she worked there, plaintiff complained about Springer's conduct several times. As noted above, she first complained to human resources. Next, after complaining to Springer about the menial nature of her assignments, she addressed that complaint to the affirmative action office. She expressed the view that Springer might be discriminating against her because she is a woman, although she also thought it possible that Springer simply did not like her personally. The man she met with reportedly told her, "[Y]ou're not going to be able to prove [discrimination]. If you try to prove it, you are going to lose your job. Your best bet is

to go with mediation." Plaintiff agreed to mediation, but Springer was uncooperative, and the mediation resolved nothing.

Plaintiff next complained when she was told that the university was losing its training status because Springer had not turned in the wage survey. She went to Springer's boss, Rabold, and another administrator, both of whom told her that they could not help. She complained again when Springer forced her to quit the safety committee, a volunteer activity that she enjoyed. She met with Rabold, who suggested that it was her fault that she and Springer did not get along, told her that she had better work things out with Springer or do her apprenticeship elsewhere, and threatened that, if she complained again, she would lose her job. That meeting was not an isolated incident; Rabold made it very clear to plaintiff on many occasions that, if she complained about Springer again, she would lose her job, so plaintiff stopped complaining until Rabold left the university's employ. At that time, she sent a letter to Hecht, the man who replaced Rabold, again reporting Springer's discriminatory treatment of her. When she met with Hecht, after sending him the letter and just before plaintiff attained her journeyman's status, Hecht told her that the university would not be hiring her for a permanent position. Plaintiff accepted that pronouncement but asked Hecht to investigate Springer's repeated discrimination against her over the last four years. Hecht refused, insisting that, as a temporary employee, plaintiff did not have "the right to fight discrimination." When plaintiff threatened to sue if he refused to investigate the discrimination, Hecht responded simply, "That's your choice."

Shortly after that conversation, the shop suddenly had no work. At first plaintiff tried to create work for herself. Soon, however, she would simply return home after showing up for work because the shop "had to pay for itself," and plaintiff felt bad because she was "breaking the shop sitting around doing nothing." For the next three months, having attained her journeyman electrician's license, plaintiff alternately did electrical work, updated manuals in the shop, helped out laborers, or went home early without pay.

During that period, other electricians in the shop supplemented their income by performing "standby work." Standby work is akin to being on call—that is, being available to work on an as-needed basis on weekends and evenings during big events. Electricians in the shop obtained standby work by signing up for specific dates on a sheet that was passed around. Before she obtained her journeyman's license, plaintiff signed up for several dates that were to fall after the date on which she anticipated receiving her license. She was informed, however, that she could not perform standby work.

Eventually, at the end of three months, plaintiff was laid off. Initially, she was told to simply stop showing up for work, but plaintiff informed her supervisors that she would not "quit" and that the university would have to "fire" her or "lay her off." Shortly thereafter, plaintiff received a letter from an administrator at the university's main administrative office informing her that she was being laid off "due to a lack of work due to the end of [her] apprenticeship." The letter stated that plaintiff's dismissal was listed with the unemployment office as a layoff. After plaintiff left the university's employ, she received unemployment benefits. Plaintiff applied for the first journeyman electrician position that opened at the university, which occurred two years after her layoff, but the university declined to interview her.

Plaintiff brought four claims against the university. The first two, a federal discrimination claim under Title VII of the Civil Rights Act of 1964, 42 USC section 2000e-2 (2000), and its state counterpart, *former* ORS 659.121 (1999), *repealed by* Or Laws 2001, ch 621, § 90[1] (governing civil suits against employers for discrimination and retaliation), were based solely on plaintiff's inability to perform standby work. The second two claims—again, one federal claim under Title VII and a corresponding state law claim—alleged that the university retaliated against her for opposing the university's allegedly discriminatory practices by (1) discriminating

---

[1] Although the 2001 legislature repealed ORS 659.121, it also enacted ORS 659A.885, which now governs civil actions for employment discrimination and retaliation. We apply the 1999 version because plaintiff filed the original complaint in this action in 2000.

against plaintiff in the terms and conditions of her employment, (2) discharging plaintiff, and (3) barring plaintiff from future employment.

After plaintiff testified as recounted above, she rested her case. The university moved for a directed verdict and involuntary dismissal, both of which the trial court granted. The written order granting those motions is unclear as to which motion disposed of which claims, but a directed verdict was the appropriate disposition for claims that were to go to the jury and an involuntary dismissal was the appropriate disposition for claims on which the court was to act as the factfinder. ORCP 60; ORCP 54 B(2). We conclude that the directed verdict motion necessarily applied to plaintiff's retaliation claim under Title VII because that claim—in which plaintiff sought compensatory damages pursuant to 42 USC section 1981a(a)(1)—carries the right to a jury trial. 42 USC § 1981a(c). In the other three claims, plaintiff requested equitable relief, and the statutes under which plaintiff brought those claims do not entitle her to a jury determination. *See id.* (the right to a jury trial attaches to a federal discrimination claim only when compensatory—and not equitable—relief is sought); *former* ORS 659.121; *Wincer v. Ind. Paper Stock Co.*, 48 Or App 859, 863, 618 P2d 15 (1980) (no right to a jury trial under *former* ORS 659.121). We therefore assume that the judgment of involuntary dismissal applied to the state retaliation claim and both discrimination claims.

We begin with the directed verdict. A directed verdict based on insufficiency of the evidence is appropriate "only if there is a complete absence of proof of an essential issue, [or] if there is no conflict in the evidence and it is susceptible of only one construction[.]" *Day v. City of Canby*, 143 Or App 341, 345, 922 P2d 1269 (1996), *rev den*, 324 Or 654 (1997). In reviewing the grant of a directed verdict, we look for any evidence that would allow a reasonable factfinder to return a verdict for the plaintiff. *Kotera v. Daioh Int'l U.S.A. Corp.*, 179 Or App 253, 272, 40 P3d 506 (2002). The directed verdict here was correct, then, only if the evidence was insufficient for a reasonable juror to find all the elements of plaintiff's federal retaliation claim.

■ ■ Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees for filing administrative or other complaints concerning the employer's alleged discriminatory practices. 42 USC § 2000e-3(a). An employee can prevail on a retaliation claim by establishing that the employer retaliated against her for opposing claimed discriminatory practices even if the practices were not, in fact, discriminatory. *See, e.g., Sisco v. J.S. Alberici Constr. Co., Inc.*, 655 F2d 146, 150 (8th Cir 1981), *cert den*, 455 US 976 (1982); *Sias v. City Demonstration Agency*, 588 F2d 692, 695 (9th Cir 1978). To establish retaliation, a plaintiff must show (a) participation in a protected activity known to the university, (b) an employment action disadvantaging the plaintiff, and (c) a causal connection between the protected activity and the adverse employment action. *DeCintio v. Westchester County Medical Center*, 821 F2d 111, 115 (2d Cir), *cert den*, 484 US 965 (1987).

Plaintiff presented evidence that she participated in numerous protected activities, which may include informal complaints to superiors. *O'Neal v. Ferguson Constr. Co.*, 237 F3d 1248, 1255 (10th Cir 2001); *Rollins v. State of Florida Dep't of Law Enforcement*, 868 F2d 397, 400 (11th Cir 1999). She testified that she complained about Springer's alleged discrimination to the human resources department, the affirmative action office, and both of Springer's supervisors, Rabold and Hecht. Plaintiff also testified that she suffered adverse employment actions. She testified that the university stopped giving her work to do, that it laid her off, and that it barred her from future employment, as evidenced by its refusal to interview her for a later job.

■ Finally, plaintiff presented sufficient evidence of a causal connection between her complaints and the lack of work that led to her ultimate dismissal.

> "Proof of a causal connection can be established [1] *indirectly*, by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or [2] *directly*, through evidence of retaliatory animus directed against a plaintiff by the defendant."

*DeCintio*, 821 F2d at 115 (emphasis in original; citations omitted). If the plaintiff attempts to establish the causal connection indirectly, relying on mere temporal proximity between the events, the events must be "very close" in time. *Clark County School Dist. v. Breeden*, 532 US 268, 273, 121 S Ct 1508, 149 L Ed 2d 509 (2001). Here, the trial court determined that plaintiff's protected activities were not "very close" in time to the adverse employment actions and that plaintiff presented no additional evidence of causation. The court rejected plaintiff's argument that she was relying not only on temporal proximity but also on her testimony that Rabold told her repeatedly that she would be fired if she complained again. From that testimony, plaintiff argued, the jury could infer that she was laid off because she did complain again. We agree with plaintiff.

Unlike the plaintiff in *Breeden*, who relied on temporal proximity alone to prove causation, plaintiff in this case did not rely on the proposition *post hoc ergo proctor hoc—* after the fact, therefore, because of the fact. Instead, she testified that Springer's superior, Rabold, told her on many occasions that, if she complained about Springer again, she would lose her job. She also testified that Hecht, Rabold's replacement, displayed a similar attitude toward her by refusing to investigate her claims of discrimination and telling her that, as a temporary employee, she had no right to combat discrimination. A reasonable juror could infer from that evidence that Hecht shared his predecessor's view of plaintiff as a troublemaker whose complaints should stop. That inference, coupled with the indirect evidence that she "suddenly" was given no work after her conversation with Hecht and that she was laid off a few months later, would allow a reasonable juror to conclude that the university stopped giving plaintiff work and subsequently terminated her in retaliation for her continued complaints. The trial court erred in concluding otherwise.

The university advances an alternative argument about why we should affirm the trial court's decision. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (explaining the "right for the wrong reason" rationale for affirmance). It argues that plaintiff could not have lost her job as a result of her complaints

because her employment would have ended in any event. The university asserts that plaintiff's employment was temporary and that it ended on schedule when plaintiff completed her apprenticeship and obtained her journeyman's license. We reject that alternate argument for two reasons

First, the undisputed evidence is that plaintiff's employment did not end when she completed her apprenticeship; it continued for three months after she received her journeyman's license. If the parties originally had an agreement that plaintiff's employment would end as soon as she received her journeyman's license, they evidently did not stick to the agreement.

Second, there is also evidence that plaintiff's employment did not end as the result of a prior agreement between the parties. Plaintiff testified that she received a letter that stated that she was being laid off "due to the end of [her] apprenticeship due to a lack of work." Viewed in the light most favorable to plaintiff, a juror could infer from that testimony that plaintiff was laid off due to her apprenticeship ending *and* due to a lack of work. Plaintiff also testified that the letter stated that her dismissal was listed with the unemployment office as a layoff and that she received unemployment benefits. A reasonable juror, therefore, could find that plaintiff did not lose her job because she obtained her journeyman's license but, as discussed above, because the university retaliated against her. Accordingly, the trial court erred in granting the university's motion for a directed verdict. Additionally, because the court dismissed plaintiff's state law retaliation claim based on the same erroneous reasoning that it applied to the federal claim, it erred in dismissing that claim as well.[2]

We turn to the involuntary dismissal of plaintiff's discrimination claims. ORCP 54 B(2),[3] governing motions for

---

[2] Both parties treat the state and federal retaliation claims as identical for purposes of this appeal. We do likewise, notwithstanding the differences discussed below between a directed verdict and an involuntary dismissal and notwithstanding certain differences in the state and federal retaliation laws that do not affect our analysis.

[3] That rule provides:

"After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for

involuntary dismissal, allows the trial court "to weigh the evidence, to determine the facts without making inferences in favor of [the] plaintiff, and to grant or deny the motion accordingly." *Castro and Castro*, 51 Or App 707, 710, 626 P2d 950 (1981). An involuntary dismissal should be sparingly granted and is appropriate where a plaintiff produced no credible evidence of the essential elements of her claims. *Id.* at 713. In this case, the trial court found that plaintiff presented no evidence at all of her requested damages. In her amended complaint, the sole relief that plaintiff sought on both her state and federal discrimination claims was "equitable restitution equal to one-eighth of the gross wages paid to male workers for all 'standby coverage' labor performed by them from January 1, 1999 through December 31, 1999."[4] The trial court found that "there was no evidence that there was in fact work given to the other journeyman electricians on standby" and therefore "there has been no evidence which would allow the Court to grant any equitable restitution that was sought." We agree that plaintiff presented no evidence of the amount of standby work, if any, that the male electricians performed during the relevant period nor of the wages that they may have earned for such work. Indeed, plaintiff does not contend that she did present any evidence of damages, nor does she offer any argument about why that failure is not dispositive of her claims. The trial court did not err in dismissing plaintiff's discrimination claims.

Judgment on state and federal retaliation claims reversed and remanded; otherwise affirmed.

---

a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as a trier of the facts may then determine them and render judgment of dismissal against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment of dismissal with prejudice against the plaintiff, the court shall make findings as provided in Rule 62."

[4] Plaintiff has not been entirely consistent about which months she was entitled to perform standby work. She has, at times, conceded that she was not qualified to perform standby work during the period that she had her "work alone card" but before she obtained her journeyman's license. The precise period is irrelevant to our analysis, as it was to the trial court's.