Argued and submitted July 30, 2020, reversed and remanded March 2, 2022

Blaine Justin BOYD,
*Plaintiff-Appellant,*

*v.*

LEGACY HEALTH,
*Defendant-Respondent.*

Multnomah County Circuit Court
17CV22688; A169425

507 P3d 715

Plaintiff, a former employee of defendant, Legacy Health, appeals a judgment dismissing his claims for statutory retaliation and common-law wrongful discharge. The trial court granted defendant's motion for summary judgment on those claims, concluding that there were no triable issues of fact as to whether defendant had fired plaintiff because plaintiff had engaged in a statutorily protected activity or an activity that fulfilled an important public duty. On appeal, plaintiff argues that the trial court erroneously understood his attorney's arguments as conceding that plaintiff's employment had been terminated for a lawful reason. Plaintiff further argues that the trial court erred in granting defendant's motion for summary judgment because it relied on the purported concession. *Held*: The trial court erred in treating plaintiff's attorney's arguments at the summary-judgment hearing as a concession that defendant had fired plaintiff for a lawful reason. Further, in the absence of such a concession, the trial court erred in concluding that plaintiff had not raised a genuine issue of material fact as to defendant's reason for terminating plaintiff's employment.

Reversed and remanded.

Cheryl A. Albrecht, Judge.

Justin Steffen argued the cause for appellant. Also on the briefs was Steffen Legal Services, LLC.

Crystal S. Chase argued the cause for respondent. Also on the brief were Brenda K. Baumgart, Caroline J. Livett and Stoel Rives, LLP.

Before Mooney, Presiding Judge, and Lagesen, Chief Judge, and DeHoog, Judge pro tempore.*

DeHOOG, J. pro tempore.

Reversed and remanded.

_____

* Lagesen, C. J., *vice* Hadlock, J. pro tempore.

**DeHOOG, J. pro tempore**

Plaintiff, a former employee of defendant, Legacy Health, appeals a judgment dismissing his claims for statutory retaliation and common-law wrongful discharge. The trial court granted defendant's motion for summary judgment on those claims, concluding that there were no triable issues of fact as to whether defendant fired plaintiff because plaintiff had engaged in a statutorily protected activity or an activity that fulfilled an important public duty, as required to establish plaintiff's claims. Plaintiff raises a single assignment of error in which he argues that the trial court erred in concluding that he had not raised a genuine issue of fact as to any of his claims. We agree with plaintiff that, to the extent that the trial court treated his attorney's arguments at the summary-judgment hearing as a concession that defendant had fired plaintiff for a lawful reason, the court erred. We further agree that, in the absence of such a concession, the trial court erred in concluding that plaintiff had not raised a genuine issue of material fact as to defendant's reason for terminating plaintiff's employment. As a result, it was error to grant defendant's motion for summary judgment, and we, therefore, reverse and remand.

Under ORCP 47 C, summary judgment is appropriate when

> "the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law. *** The adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial."

*See Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). That standard is met when "no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C.

We review an order granting summary judgment for errors of law. *Ellis v. Ferrellgas, L.P.*, 211 Or App 648, 652, 156 P3d 136 (2007). In conducting our review, we view the facts and all reasonable inferences that may be drawn

from them in favor of the nonmoving party, who in this case is plaintiff. *Jones*, 325 Or at 408. We state the facts in accordance with that standard.

Plaintiff is a registered nurse who previously worked nights for defendant, Legacy Health, primarily in its Neuro Trauma Intensive Care Unit. During the night of September 6, 2016, plaintiff was working at the hospital when a medical alarm associated with one of his assigned patients went off. Plaintiff's coworkers later reported that they had initially been unable to find him, but, according to one coworker, he was eventually found sleeping under a blanket in the same patient's room. Separately, but during the same shift, plaintiff noticed that Green, another nurse at the hospital, had made medication and charting errors involving another of plaintiff's patients.

On September 15, 2016, plaintiff discussed the September 6 incident with Cecil, the managing nurse for his unit. Plaintiff denied the allegation that he had been sleeping on duty. Following his meeting with Cecil, plaintiff told a coworker about the medication and charting errors that he had found in Green's work. That coworker shared plaintiff's observations with Green, who in turn asked Cecil to review the medical records for any errors that she might have made.

Cecil again met with plaintiff, this time to discuss his report that Green had made medication and charting errors. Cecil told plaintiff that she had been unable to find the errors that he had reportedly found. When plaintiff asked Cecil whether he should file an "ICARE" report, which he understood to be standard procedure, Cecil instructed him not to do so.[1] On October 7, Cecil issued plaintiff a written "CORRECTIVE ACTION" stating that plaintiff had been asleep or given the appearance of sleeping during his shift on September 6 and that he had falsely reported charting errors by Green, "possibly in retaliation for her having reported that you had not been responding to patient alarms

_____

[1] "ICARE" is the name of an internal reporting system that defendant maintains. Doepken, an interim manager who later replaced Cecil, testified during her deposition that there would be "good cause to file an ICARE report" if a nurse were to observe errors in a patient's chart.

and had been discovered in the patient's room." However, another nurse, Shambry, and not Green, had made that report to Cecil.

Two days after receiving the written reprimand from Cecil, plaintiff went to the hospital on a night that he was not scheduled to work and accessed defendant's medical-records system. Plaintiff accessed defendant's records at that time to verify for himself whether the charting errors that he had observed were in fact present. As a result of that review, plaintiff determined that Green had made charting or medication errors.

The following week, plaintiff once more met with Cecil and again told her what he had discovered in his patient's records. Cecil responded by requesting an audit related to defendant's privacy policies. The resulting audit revealed that plaintiff had accessed his patient's chart at a time when he had not been scheduled to work.

The discovery that plaintiff had accessed a patient's records while off shift resulted in a meeting involving interim manager Doepken (who had recently replaced Cecil as plaintiff's managing nurse following Cecil's retirement), Schaff, a representative from defendant's human-resources (HR) department, and plaintiff. At that meeting, which took place November 11, 2016, Doepken asked plaintiff why he had accessed the medical records on October 9, when he had not been scheduled to work. Plaintiff did not tell Doepken that he had accessed the records due to his concerns about Green's patient care or chart keeping, or, for that matter, for any other reason.

At that point, Doepken told plaintiff that she would have to take the audit report at "face value" and that, as a result, his employment would be terminated. That is, because plaintiff had accessed his patient's medical records without authorization, he had violated defendant's privacy policies. On November 14, plaintiff received a termination letter from Doepken stating that his employment was being terminated because he had violated defendant's Health Insurance Portability and Accountability Act (HIPAA) privacy policy. Doepken did not assert that plaintiff's conduct

had somehow violated HIPAA itself, and she was unable to identify any specific provision of defendant's privacy policy that plaintiff had violated; she instead appears to have relied on the fact that she did not know why plaintiff had accessed the records when he did and that she could not know whether plaintiff had used or intended to use the information for an improper purpose.

Following his termination, plaintiff sued defendant and asserted four claims: (1) statutory retaliation under ORS 659A.199 (prohibiting discrimination due to employee's good-faith report of violation of law); (2) statutory retaliation under ORS 441.181 (prohibiting retaliatory action against nursing staff by hospital); (3) common-law wrongful discharge; and (4) an unpaid wage claim. The parties settled plaintiff's wage claim before trial. Plaintiff's remaining three claims were all premised on the theory that his employment had been wrongfully terminated in retaliation for his report of medication and charting errors.

Defendant moved for summary judgment on each of plaintiff's claims. Defendant argued that plaintiff had not engaged in protected activity, as required to establish liability under ORS 659A.199 and ORS 441.181, and had not engaged in an activity that fulfilled an important public duty, as required by the common-law wrongful-discharge claim. Alternatively, defendant argued that plaintiff had not produced evidence raising a genuine issue of material fact as to whether defendant had terminated plaintiff's employment *because* he had engaged in a protected activity or an activity that fulfilled an important public duty. In that regard, defendant argued that the summary-judgment record established that the only reason that plaintiff's employment had been terminated was that he had inappropriately accessed a patient's medical records in violation of defendant's HIPAA privacy policy.

Plaintiff responded to defendant's first argument by identifying various Oregon administrative rules that govern a nurse's standard of care, arguing that those rules imposed a duty on plaintiff to report medication and charting errors. In response to defendant's alternative argument regarding causation, plaintiff conceded that he had engaged

in the conduct in question—that is, he had accessed patient records at a time when he was not on duty—but argued that his conduct had not been inappropriate and that defendant's stated reason for terminating his employment was merely pretextual.

At the summary-judgment hearing, defendant asserted that plaintiff's briefing effectively conceded that the sole reason that defendant had fired plaintiff was that he had inappropriately accessed a patient's medical charts. The court asked plaintiff's attorney to clarify whether in fact that point was conceded. Counsel initially agreed that he had made the concession; counsel quickly clarified, however, that plaintiff's position was that, although he acknowledged having accessed those records, he did not concede that he had done so *inappropriately*. Following that exchange, the trial court ruled that the access had indeed been inappropriate and that defendant had terminated plaintiff's employment solely for that reason. Specifically, the court ruled:

> "I'm granting the motions for summary judgment on the first three claims, the common law claim and the two statutory claims, because that's the reason he was fired because he—in my view, and it's not a fact issue, he inappropriately accessed the records."

Accordingly, the court entered a general judgment dismissing plaintiff's three wrongful-discharge claims. This appeal followed.

On appeal, plaintiff raises a single assignment of error, contending that the trial court erred "in granting Defendant's Motion for Summary Judgment as to Plaintiff's 1st, 2nd, and 4th Claims for Relief."[2] Plaintiff argues that the trial court erred in accepting his attorney's purported

_____

[2] As an initial matter, defendant urges us to reject plaintiff's assertions of error without consideration because his brief does not comply with ORAP 5.45(2) ("Each assignment of error must be separately stated.") or ORAP 5.45(3) ("Each assignment of error must identify precisely the legal, procedural, factual, or other ruling that is being challenged."). To the extent that plaintiff's opening brief may be deficient in that manner, we nonetheless decline defendant's suggestion and proceed to the merits of this appeal. *See Appleyard v. Port of Portland*, 311 Or App 498, 492 P3d 71 (2021) (addressing merits of an appeal where opening brief erroneously identified appeal issues in preservation section rather than assigning them as error).

concession and, largely due to that concession, concluding as a matter of law that defendant had terminated plaintiff's employment solely because he had inappropriately accessed medical records. For the reasons that follow, we agree with plaintiff that his attorney's statements cannot reasonably be understood as having conceded that defendant fired plaintiff for a lawful reason. We further conclude that, whether or not the trial court viewed counsel's statement as a concession, it erroneously understood that plaintiff's claims could not succeed if he had inappropriately accessed a patient's records, a matter that the court appears to have decided as a question of law. Finally, we disagree with defendant's assertion that the trial court's rulings should be upheld on the basis of one of the alternative arguments that defendant made to the trial court but that the court did not decide. Accordingly, we reverse and remand.

As noted, at the summary-judgment hearing, defendant characterized plaintiff's written argument as conceding that defendant had fired plaintiff only because he had inappropriately accessed a patient's medical records. The following exchange then took place between the trial court and plaintiff:

"THE COURT:  —do you think you admit in your response that your client admits that the sole reason he was fired was because he accessed the patient records during the middle of [the] night that time?

"[PLAINTIFF'S COUNSEL]:  Yes, your honor. I—

"THE COURT:  You admit that was the sole reason he was fired?

"[PLAINTIFF'S COUNSEL]:  Well, I admit that he was fired because Legacy says that access was inappropriate—

"THE COURT:  Well, that's different.

"[PLAINTIFF'S COUNSEL]:  —and violated—

"THE COURT:  You—you agree that that's the reason he was terminated?

"[PLAINTIFF'S COUNSEL]:  Yes.

"* * * * *

"THE COURT:  So, if he was terminated because he violated their patient privacy rules, then he wasn't retaliated against, was he?

"[PLAINTIFF'S COUNSEL]:   Right. And that's where the difference is. I don't think he did violate either of the policies, certainly not the law itself.

"THE COURT:   I understand, though. I think he did.

"* * * * *

"[PLAINTIFF'S COUNSEL]:  Isn't that a question of facts?

"THE COURT:  No, it's not. He admits what he did. There's no facts in dispute. The question is whether that constituted a violation of the policy, and I think it was.

"* * * * *

"THE COURT:   Tell me what response you might have to that.

"[PLAINTIFF'S COUNSEL]:   If it's determined that the access was inappropriate, then I agree. His claims would fail.

"* * * * *

"[PLAINTIFF'S COUNSEL]:  —with all due respect, maintain that's a question of fact for the jury[.]"

The court then granted defendant's motion for summary judgment on all three of plaintiff's wrongful-discharge claims, evidently ruling as a matter of law that the reason that plaintiff had been fired was because he had inappropriately accessed a patient's medical records.

        The trial court's stated rationale for granting summary judgment is flawed in at least two ways. First, in light of plaintiff's summary-judgment briefing—which, contrary to defendant's assertion, does not concede that defendant fired plaintiff for a lawful reason—counsel's statements cannot be understood as making such a concession. Second, without that concession, the court was mistaken to understand that its conclusion that plaintiff had violated defendant's privacy policies necessarily resolved any otherwise genuine issues of material fact. In other words, even if the

trial court correctly concluded that the question of whether plaintiff's conduct violated defendant's privacy policies was one of law—a matter on which we express no opinion—it was mistaken to conclude that that necessarily disposed of plaintiff's claims. More specifically, even if plaintiff's conduct in accessing a patient's medical chart on his day off gave defendant a lawful reason to terminate his employment, that conclusion would not necessarily resolve any factual dispute as to whether in fact plaintiff had been fired for that reason or, instead, for the unlawful reason that he had engaged in protected activity or activity that fulfilled an important public duty.

To understand our first conclusion, plaintiff's statements at the hearing must be placed in the context of the argument that he made before the hearing in his written response to defendant's summary-judgment motion. As we understand that argument, his position was essentially that his entire course of conduct—his discovery of Green's medication and charting errors, his reporting of that discovery to Cecil, and his subsequent confirmation of the errors by consulting the records system on his day off—collectively constituted the protected activity that led to his termination. Given that understanding, counsel's affirmative response to the trial court's question, "[Y]ou agree that that's the reason he was terminated?" is simply counsel's agreement that plaintiff was fired for engaging in a course of protected activity that *culminated* in accessing his patient's medical records. That is especially apparent given the below exchange, which preceded counsel's ostensible concession.

As noted above, the relevant colloquy began with the trial court asking:

> "[D]o you think you admit in your response that your client admits that the sole reason he was fired was because he accessed the patient records during the middle of [the] night that time?"

As counsel began to respond, the court repeated its question, asking, "You admit that was the sole reason he was fired?" Plaintiff's attorney responded, "Well, I admit that he was fired because Legacy *says* that access was inappropriate *** and violated—." (Emphasis added.) Before counsel could

tell the court what defendant was *saying* plaintiff's con-
duct had violated—which, in context, appears to have been
defendant's privacy policies—the trial court asked its ques-
tion, "You agree that that's the reason he was terminated?,"
provoking counsel's affirmative response. At most, then,
that response can be viewed as conceding that defendant's
*proffered* reason for firing him was that he had accessed a
patient's records when off shift, and not that defendant had
in fact acted on that basis.

As for our second conclusion—that the trial court
mistakenly understood that plaintiff could not prevail if his
conduct violated defendant's privacy policy—we note that
the court appears to have relied on a faulty premise. The
trial court asked plaintiff, "[I]f he was terminated because
he violated their patient privacy rules, then he wasn't retal-
iated against, was he?" Plaintiff indicated his agreement
with that statement in the abstract, but emphasized his
view was that there had been no violation. Wholly missing
from this discussion, however, is whether in fact that was
defendant's reason for firing plaintiff. And that question—
whether the true motivation for plaintiff's termination was
that he had inappropriately accessed a patient's medical
records—is a question of fact. "A plaintiff's *prima facie* case
does not disappear merely because a defendant asserts a
non-discriminatory reason which may or may not persuade
the trier of fact." *Henderson v. Jantzen Inc.*, 79 Or App 654,
658, 719 P2d 1322, *rev den*, 302 Or 35 (1986) (rejecting defen-
dant's argument that it was entitled to summary judgment
simply because the record could support its general defense).

By proceeding from the premise that plaintiff could
not prevail on any of his wrongful-discharge claims if he
had violated defendant's privacy policies, the trial court mis-
applied the summary-judgment standard. True, *if*, in fact,
plaintiff violated defendant's policies and *if*, in fact, defen-
dant fired him for that reason, plaintiff would be unable to
establish an essential element of each of his claims, namely,
that defendant had fired him because he had engaged in
a protected activity. But because defendant's true motiva-
tion was a question of fact and plaintiff did not concede the
answer to that question, the trial court should not have
granted summary judgment on that basis. *See, e.g.*, *Huber*

*v. Dept. of Education*, 235 Or App 230, 240, 230 P3d 937 (2010) ("Whether an employer who discharged an employee was motivated by an impermissible reason is a question of fact.").

Although we conclude that the trial court's stated rationale for granting summary judgment was erroneous, that conclusion does not wholly resolve this appeal. Citing *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001), defendant contends that we can and should uphold the court's summary-judgment ruling because it was "right for the wrong reason." As alternative bases on which we might affirm, defendant argues the following: (1) plaintiff's statutory-retaliation claims fail as a matter of law because he did not engage in "protected activity" under ORS 659A.199(1) or ORS 441.181(1);[3] (2) plaintiff's activity did not fulfill an important public duty as required for a common-law wrongful-discharge claim; and (3) the sole decision-maker regarding plaintiff's termination lacked a retaliatory motive, which precludes a finding of causation as to any of plaintiff's three claims.

Before considering those alternative arguments, we note that, as we recently clarified in *Sherertz v. Brownstein Rask*, 314 Or App 331, 341, 498 P3d 850 (2021), the "right for the wrong reason" doctrine is not implicated in an appeal such as this one, where the alternative arguments were raised in the trial court and not for the first time on appeal. Here defendant raised each of the foregoing arguments in briefing to the trial court, and plaintiff was afforded an opportunity to respond to them. Additionally, those arguments all raise questions of law, and it is therefore appropriate for us to consider them. *Id.* (when alternative argument has been made in the trial court and raises a question of law, we may simply resolve it). Thus, we proceed to consider defendant's arguments without first determining whether

---

[3] As we turn to the specifics of plaintiff's statutory claims, we observe that neither ORS 659A.199(1) nor ORS 441.181(1) expressly refers to "protected activity." The parties, however, use that term as shorthand for conduct that each of those provisions encourage by prohibiting discrimination or retaliation against employees who engage in such conduct. We use the term with the same understanding throughout this opinion, as has been our practice. *See e.g.*, *Meyer v. Oregon Lottery*, 292 Or App 647, 426 P3d 89 (2018).

they satisfy the requirements of *Outdoor Media Dimensions Inc. See id*. (noting additional requirements and discretionary character of "right for the wrong reason" review).

Defendant's first two alternative arguments raise essentially the same issue: whether plaintiff's conduct in reporting perceived medication and charting errors in another nurse's work constituted protected activity, as required to establish plaintiff's statutory claims, or fulfilled an important public duty, a required element of his common-law claim. Although our analysis as to each differs somewhat, we conclude in each instance that defendant's argument fails.

We begin with defendant's argument that plaintiff's statutory-retaliation claim under ORS 659A.199(1) fails as a matter of law because plaintiff did not engage in protected activity. Specifically, defendant argues that, rather than constituting a protected disclosure, plaintiff's conduct of reporting Green's charting error to his manager Cecil amounted only to a general complaint regarding Green's performance. For the following reasons, we disagree.

Under ORS 659A.199(1),

"[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that *the employee has in good faith reported information that the employee believes is evidence of a violation* of a state or federal law, rule or regulation."

(Emphasis added.) As we have previously explained, ORS 659A.199 applies a subjective, good faith standard to employees who report perceived violations of the law. *See Hall v. State of Oregon*, 274 Or App 445, 453, 366 P3d 345 (2015) (noting that ORS 659A.199's express "[r]eference to the employee's belief indicates a subjective, good faith standard"). Thus, an employee has engaged in protected activity under that provision if the employee has reported information that he or she subjectively believes is a violation of a

state or federal law, rule, or regulation and has a good faith basis for that belief.

Plaintiff has identified several state administrative rules establishing nursing standards that a nurse's charting errors might violate. As one example, OAR 851-045-0070 (4)(c) expressly identifies "entering inaccurate, incomplete, falsified or altered documentation into a health record or agency records" as "conduct derogatory to the standards of nursing." Here the record includes plaintiff's testimony that he had found inaccurate entries in a patient's chart made by another nurse, Green. Defendant does not dispute that, if in fact Green made charting errors, that conduct would fall short of the nursing standards established by, among other provisions, OAR 851-045-0070(4)(c). Thus, if a jury or other factfinder were to believe plaintiff's testimony as to what he had discovered in his patient's chart, it could reasonably infer both that he had subjectively believed that Green's performance violated OAR 851-045-0070(4)(c) and that he had a good faith basis in fact and law for that belief, even if it were to ultimately prove untrue. As a result, defendant's contention that plaintiff could not, as a matter of law, establish that he had engaged in protected activity for purposes of ORS 659A.199(1) fails.

We reach a similar conclusion as to plaintiff's claim under ORS 441.181(1). That statute specifically governs retaliatory actions in the health-care context and provides, in relevant part,

"A hospital may not take retaliatory action against a nursing staff because the nursing staff:

"(a)   Discloses or intends to disclose to a manager, a private accreditation organization or a public body an activity, policy or practice of the hospital or of a hospital that the nursing staff[4] reasonably believes is in violation of law or a rule or is a violation of professional standards of practice

---

[4]  Under ORS 441.179(4), "nursing staff" is defined as including, among others, registered nurses and licensed practical nurses. "Retaliatory action" includes "discharge * * * or other adverse action taken against a nursing staff in the terms or conditions of employment of the nursing staff, as a result of filing a complaint." ORS 441.179(6).

that the nursing staff reasonably believes poses a risk to the health, safety or welfare of a patient or the public[.]"

Defendant's principal argument appears to be that, because plaintiff's report related to an individual nurse's performance, rather than a hospital-wide concern, it cannot have been a disclosure of "an activity, policy or practice * * * *of a hospital*" so as to be protected activity under this provision. *See* ORS 441.181(1) (emphasis added). We disagree. Defendant does not dispute that chart maintenance is a hospital "activity," and it cannot reasonably dispute that an entity like a hospital acts through its employees and other human agents, including its nurses. Beyond that, defendant points to nothing in the plain text of ORS 441.181(1) or elsewhere that can support its argument that plaintiff's report of Green's charting error was not protected activity under that statute.[5] Thus, we reject defendant's second statutory argument for much the same reason as its first.

Turning to defendant's argument under the common law, we conclude that, to the extent that plaintiff discovered another nurse's errors in his patient's chart, his conduct in reporting those errors fulfilled an import public duty so as to satisfy that element of his wrongful-discharge claim. "The discharge of an employee is actionable where the employee is discharged for fulfilling an 'important public duty.' *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002). Whether an 'important public duty exists' is a question of law." *Huber*, 235 Or App at 242. Defendant argues that, as a matter of law, plaintiff cannot satisfy that element of his wrongful-discharge claim. We conclude otherwise.

We have explained the "public duty" element of a common-law wrongful-discharge claim as follows:

"If a party brings a common-law wrongful discharge claim under the important-public-duty exception to at-will employment, 'it is necessary to find a public duty, not create one, using constitutional and statutory provisions, or the case

_____

[5] Defendant points to various statutory definitions of "hospital," but none of those supports an argument that ORS 441.181(1) applies only to institution-wide activities or that a hospital can act autonomously, as opposed to through its human agents.

law of this or other jurisdictions.' [*Babick*, 333 Or] at 409
\*\*\* When identifying an important public duty, 'we review
statutes and other authorities for evidence of a substantial
public policy that would \*\*\* be "thwarted" if an employer
were allowed to discharge its employee without liability.'
*Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 380, 879
P2d 1288 (1994), *rev dismissed*, 321 Or 511 (1995) (quoting
*Nees* [*v. Hocks*], 272 Or [210, ]219[, 536 P2d 512 (1975)])."

*McManus v. Auchincloss*, 271 Or App 765, 771–72, 353 P3d
17, *rev den*, 358 Or 145 (2015). Thus, we must determine
whether some source of law makes it a public duty for nurses
who observe charting errors to report what they have
observed. *Id*. at 771 (emphasizing our role to "find" a public
duty, not to create one); *see also Huber*, 235 Or App at 242-44
(finding public duty in former administrative rule requiring
a person that knows that a licensed nurse's behavior or prac-
tice has fallen below accepted nursing standards to report
the nurse to an appropriate authority figure).

     As with his statutory claims, plaintiff points to var-
ious administrative rules as establishing a public duty to
report. Defendant acknowledges those rules, but, seeking to
distinguish plaintiff's reliance on cases like *Huber*, defen-
dant argues that, in those cases, the source of law created
an affirmative reporting *requirement*, whereas in plaintiff's
case no such obligation exists. We are not persuaded. First,
our opinion in *Huber* itself recognized "that, for purposes of
a common-law wrongful discharge claim, an important pub-
lic duty could theoretically arise 'in the absence of a specific
legal obligation to perform the act or acts that trigger the
discharge,'" even if it is also true that "the sources of law
that express the asserted 'public policy' must in some sense
speak directly to those acts." 235 Or App at 243 (quoting
*Lamson v. Crater Lake Motors, Inc.*, 346 Or 628, 637-38, 216
P3d 852 (2009)). In other words, we have recognized that
a person may be performing an important public duty by
making a report even in the absence of a specific mandatory
duty to do so.

     Second, in addition to OAR 851-045-0070(4)(c), dis-
cussed above, plaintiff was subject to OAR 851-045-0090(1),
which imposes the following requirement:

"A licensee[6] knowing of a licensed nurse whose nursing practice fails to meet accepted standards for the level at which the nurse is licensed, *shall report the nurse* to the person in the work setting who has authority to institute corrective action."

(Emphasis added.) Although the specific rule at issue in *Huber* appears to have been repealed, OAR 851-045-0090(1) imposes a reporting requirement that is materially indistinguishable from the earlier rule. *See Huber*, 235 Or at 243 (discussing *former* OAR 851-045-0020(3) (Jan 3, 1995)). Thus, even more so than with the rule we considered in *Huber*, which applied when a substandard practice was dangerous enough to require a report to the nursing board, *see id.* at 243-44, here it is evident that OAR 851-045-0090(1) imposes a public duty for nurses to report in accordance with its terms, which requires nurses to report observed nursing deficiencies at least to their supervisors. Furthermore, a reasonable factfinder could find on this record that the charting errors that plaintiff observed were sufficient to give rise to that duty. Accordingly, defendant's second alternative argument also fails.

Turning finally to defendant's third alternative argument, we conclude that the summary-judgment record in this case was sufficient to raise a genuine issue of fact regarding causation, a material element of each of plaintiff's claims. Defendant argues that plaintiff cannot satisfy that element because he admitted that Doepken, the sole decision-maker regarding his termination, lacked the requisite retaliatory motive, and nothing in the record supports an inference that her decision to fire plaintiff was causally related to any protected activity in which plaintiff may have engaged. Defendant, however, takes too narrow a view of the summary-judgment record.

To recover on his statutory and common-law wrongful discharge claims, plaintiff must establish that the protected activity he engaged in was a substantial factor in the decision to terminate his employment. *See Ossanna v. Nike, Inc.*, 290 Or App 16, 28, 415 P3d 55 (2018); *aff'd* 365 Or 196,

---

[6] Under the applicable OARs, a licensee includes a registered nurse such as plaintiff. OAR 851-006-0000(82) (defining "licensee").

445 P3d 281 (2019) (noting previous cases in employment-retaliation context that required proof that the employee's protected activity was a substantial factor in the employer's adverse decision); *see also Estes v. Lewis and Clark College*, 152 Or App 372, 381, 954 P2d 792, *rev den*, 327 Or 583 (1998) (articulating the same requirement for common-law wrongful-discharge claim). We conclude that, notwithstanding plaintiff's concession that Doepken personally lacked a retaliatory motive, the summary-judgment record was sufficient to raise a triable issue of fact regarding causation.

One way for a plaintiff to satisfy the causation element in an employment-retaliation case is to rely on the imputation of subordinate bias—or "cat's paw"—theory. *Ossanna*, 290 Or App at 28-33. Under the cat's paw theory, a biased retaliatory motive held by the subordinate of an independent decision-maker can be imputed to the decision-maker if the biased subordinate influenced, affected, or was involved in the adverse employment decision against the plaintiff. *Id.* at 23 (providing an example of a cat's paw jury instruction).

Here, when viewed in the light most favorable to plaintiff, the summary-judgment record was arguably sufficient to support a cat's paw theory of causation. *See id.* at 34 (noting that burden of establishing existence of a disputed fact issue is not high; the record need only be "capable of supporting the inference that [a decision-maker's] ostensibly independent employment decision was not wholly insulated from her subordinates' wrongful motives"). True, it is undisputed that Doepken personally lacked a retaliatory motive, and it was Doepken who fired plaintiff following her meeting with plaintiff and HR representative Schaff. However, although Doepken was plaintiff's acting manager at the time, she had only recently replaced his previous manager, Cecil. Other than questioning plaintiff at their meeting, Doepken does not appear to have conducted an independent investigation of plaintiff's performance or conduct. And before the meeting, Doepken spoke with Cecil, and Cecil told Doepken that she had previously issued plaintiff a "corrective action"; it was also Cecil who had told Doepken about the "Epic report" containing the results of defendant's

privacy audit and confirming plaintiff's off-duty accessing of a patient's chart.

To be sure, Doepken emphasized in her deposition that the decision to terminate plaintiff's employment had been her own and that the earlier written reprimand had not factored into her decision. That, she said, had been based solely upon plaintiff having accessed patient records without authorization and having failed to offer any explanation for that conduct at their meeting. However, given that Doepken both was aware of Cecil's earlier conclusions and stepped directly into Cecil's shoes as plaintiff's supervisor, a factfinder might reasonably infer that Cecil had "influenced, affected, or [been] involved" in Doepken's ultimate decision. *Id*. at 23. Therefore, if there was evidence in the summary-judgment record to support a finding that *Cecil* held a retaliatory motive, then the trial court could not, as defendant argues, have granted summary judgment on the alternative basis that plaintiff could not establish causation.

Plaintiff contends that there was such evidence, and we agree. Plaintiff's complaint alleged that Cecil had retaliated against him for reporting medication and charting errors in order to protect the reputations of defendant, of Green, and of Cecil herself. As evidence to support that allegation, plaintiff points to the fact that he was fired not long after he had engaged in protected activity, with Doepken terminating his employment less than two months after he had reported Green's charting errors. Citing our opinion in *Huber*, plaintiff argues that that temporal relationship between the two events is sufficient to raise a jury question regarding causation. *See Huber*, 235 Or App at 241 ("close temporal proximity of an employee's engagement in protected activity to termination of employment is circumstantial evidence that the employer had an impermissible motive").

We are not necessarily persuaded that the timing of plaintiff's termination was itself sufficient to support the finding that his employer had an impermissible motive. Nonetheless, we conclude that in this case, that evidence, together with other evidence in the record, was sufficient to raise a question of fact for a jury or other factfinder. As we

explained in *Meyer v. Oregon Lottery*, 292 Or App 647, 681-82, 426 P3d 89 (2018),

> "Proof of a causal connection between protected conduct and a materially adverse action can be established (1) '*indirectly*, by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct' or (2) '*directly*, through evidence of retaliatory animus directed against a plaintiff by the defendant.' *Boynton-Burns v. University of Oregon*, 197 Or App 373, 380, 105 P3d 893 (2005) (emphases in original; internal quotation marks omitted). In *Boynton-Burns*, we elaborated on the initial portion of that test by noting that, '[i]f the plaintiff attempts to establish the causal connection indirectly, relying on mere temporal proximity between the events, the events must be "very close" in time.' 197 Or App at 381, 105 P3d 893 (citing *Clark County School Dist. v. Breeden*, 532 US 268, 273, 121 S Ct 1508, 149 L Ed 2d 509 (2001))."

Thus, as plaintiff argues, evidence that his termination followed his report of Green's charting errors can serve as circumstantial evidence that the two were causally related. If, however, he sought to overcome defendant's summary-judgment motion based solely on that temporal relationship between the two events, he would have to establish that the events were "very close in time." *Id*. at 682 (internal quotation marks omitted).

Here, we need not determine whether the approximately two months between plaintiff's protected activity and his termination were close enough in time for the issue of causation to go to a factfinder. *See id*. (noting that "Oregon case law has not identified how 'very close' in time" events must be to raise issue of fact without further evidence of causation); *but see also id*. at 683 (concluding there that a "gap of one to two months between the claimed protected activity and the subsequent adverse action [was] sufficient to raise an issue of fact on causation."). That is because the circumstantial evidence in this case was not limited to the relative timing of plaintiff's termination. Rather, plaintiff also produced evidence indicating that Cecil had erroneously indicated that plaintiff may have been retaliating

against Green in making his report, when Green had not been the nurse who reported that plaintiff had been sleeping, and that Cecil had expressly told plaintiff not to file an "ICARE" report, even though, as Doepken testified, charting errors were an appropriate occasion for nursing staff to file such reports.

From that evidence, a factfinder might reasonably infer that Cecil was motivated to discredit plaintiff's report that nursing staff had made charting errors, thereby protecting the reputational interests of defendant and other employees. When viewed together with the timing of plaintiff's termination, that evidence was sufficient to raise a fact issue as to causation. *Cf. Huber*, 235 Or App at 241 (considering, as "further support" for inference of retaliatory motive under ORS 659A.203, "temporal proximity" between defendant's discovery of plaintiff's engagement in protected activity and his discharge by employer). Accordingly, it would not have been appropriate for the trial court to grant defendant summary judgment on the alternative basis that there was not a factual dispute as to causation, and we reject defendant's alternative argument urging that we affirm on that ground.

In light of the foregoing, we conclude that the trial court's stated rationale for granting summary judgment was flawed, in that the summary-judgment record did not establish, as a matter of law, that defendant terminated plaintiff's employment for a lawful reason. Moreover, defendant's proffered alternative bases for affirming the dismissal of plaintiff's claims fail because the summary-judgment record raises genuine questions of material fact as to plaintiff's engagement in protected activities or fulfillment of an important public duty and defendant's termination of his employment in retaliation therefor. Accordingly, we conclude that the trial court committed reversible error in granting summary judgment as to each of plaintiff's claims, and we therefore reverse the trial court's summary-judgment rulings and remand for further proceedings.

Reversed and remanded.