No. 760          October 30, 2024          663

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

JASMINE CUDDIGAN-PLACITO,
*Plaintiff-Appellant,*

*v.*

STATE ACCIDENT INSURANCE FUND,
an Oregon public corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
21CV02986; A179619

Eric J. Bloch, Judge. (Limited Judgment)

James D. Huegli, Judge pro tempore. (Supplemental Judgment)

Argued and submitted September 7, 2023.

Judy Danelle Snyder argued the cause for appellant. Also on the briefs were Holly Lloyd and Law Offices of Judy Snyder.

Rebecca A. Watkins argued the cause for respondent. Also on the brief were Randi J. Ensley and SBH Legal.

Before Ortega, Presiding Judge, and Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

In this workplace retaliation case, plaintiff brought claims under ORS 659A.030(1)(f), ORS 659A.199, and ORS 659A.203 against her former employer, State Accident Insurance Fund Corporation (SAIF), based on allegations that SAIF had terminated her in retaliation for reporting unlawful conduct. The trial court granted SAIF's motion for summary judgment on plaintiff's claims and entered a limited judgment in SAIF's favor.[1] On appeal, plaintiff argues that the trial court erred because genuine issues of material fact exist as to whether plaintiff engaged in a protected activity as contemplated by the statutes to support her claims. Plaintiff also asserts that the trial court erred in dismissing her claims under ORS 659A.199 and ORS 659A.203 when it failed to address a different report of illegal activity that plaintiff had alleged. In a conditional cross-assignment of error, SAIF argues that the trial court erred in concluding that plaintiff raised a genuine issue of fact that she made a "good faith report," as required by ORS 659A.199 and on the element of causation for all of her claims.

We conclude, as a matter of law, that plaintiff did not engage in a protected activity as contemplated under ORS 659A.030(1)(f) when she left a voicemail because there was no evidence that plaintiff undertook that activity to assert or defend an employee's rights under ORS chapter 659A. With respect to both ORS 659A.030(1)(f) and ORS 659A.199, we agree with SAIF on its cross-assignment of error that plaintiff failed to create a genuine issue of material fact that there was a causal link between the one activity that could be a protected activity and the adverse employment action. Finally, we conclude that an activity left unaddressed by the trial court is legally insufficient to support a claim under ORS 659A.199 or ORS 659A.203. Accordingly, we conclude that the trial court did not err in granting summary judgment to SAIF on all of plaintiff's claims, and we affirm.

## I.   FACTS

On appeal from a trial court's grant of summary judgment, we review for errors of law and we "will affirm if

---

[1] SAIF brought cross-claims against plaintiff, which survived summary judgment.

there are no genuine disputes about any material fact and the moving party is entitled to judgment as a matter of law." *Beneficial Oregon, Inc. v. Bivins*, 313 Or App 275, 277, 496 P3d 1104 (2021). "In so doing, we view the facts in the light most favorable to the nonmoving part[y]," and we "examine whether no objectively reasonable juror could find in their favor on the question at issue." *Id.* With that standard in mind, we recite the following facts in the light most favorable to plaintiff as the nonmoving party.

SAIF is an independent public corporation that provides workers' compensation insurance for Oregon employers. *See* ORS 656.751; ORS 656.752. Plaintiff was employed by SAIF as a claim investigator. Workers' compensation claims are assigned to claim adjusters, who manage the claim and work with physicians to determine the compensability of the claim. The primary responsibility of the investigator is to investigate the facts, including by conducting interviews, and provide that information to the adjuster. At the conclusion of an investigation, the investigator completes a report of investigation (ROI) and "images" it to the claim file. Plaintiff was taught by SAIF that ROIs are legal documents that must be imaged to the file. SAIF requires investigators to complete ROIs accurately without bias, and investigators do not make any recommendations to the adjuster about the claim and have no role in processing or making a decision about the claim. Investigators also do not include in ROIs their beliefs about whether a worker or witness is lying or about whether an injury did or did not happen.

In June 2020, plaintiff was assigned to investigate a claim of stress made by CR, who worked at Perlo Structures. CR claimed that he had been harassed at work because of his race. The claim was assigned to Ruth Levin as the claim adjuster. Levin requested that plaintiff first speak to the employer representative, Kimberly Wood, before speaking with CR. Levin also told plaintiff that Wood was a member of the Management-Labor Advisory Council (MLAC) and was a powerful person who could cause problems for plaintiff at SAIF. A different adjuster had offered plaintiff the same warning about Wood on a prior occasion.

As part of her investigation, plaintiff interviewed Wood, CR, witnesses identified by Wood, and additional witnesses identified by CR. Plaintiff also attempted to interview other witnesses, but those witnesses would not call her back. On July 8, 2020, plaintiff contacted her supervisor, Elizabeth Mellor, to ask for more time because she was finding it difficult to complete the ROI, she thought one witness was lying, and she wanted to get one more person's statement. On July 9, plaintiff called two witnesses and left messages. She also emailed Wood to get her help in speaking to the witnesses. Wood informed plaintiff that one of the witnesses, Josh, no longer was an employee for Perlo.

Late at night on July 9, plaintiff left the following voicemail for Josh:

"Hello Josh, this is [plaintiff], calling from SAIF Corporation again. I am hoping that you can please call me back. My number is ***. I am calling about Chile, [CR], is his full name, you know him as Chile, or Chile, however you say it in English. I'm working on his workers compensation claim for stress caused by harassment at the job site and I know he was harassed at the job site. And I know Mark—Mark and Little Boy, John, were involved and I know that they are both lying to me about what is going on because I have some other, one other witness who has given me some good information. I really need to prove that that happened at the job site, because everyone's covering it up at Perlo, including the people in charge over there. And I would really, I really need your testimony, I don't know what you know, but I think you probably know something. Anyway, what happened to Chile on the job site is wrong and we need to make it right. And I can't do it without your help so can you please call me back, my number is ***. And, I will not be sharing your information with Perlo, that I talked with you, so do not worry about that. OK, thanks, bye. Please call me."

Plaintiff testified that, right after she left the voicemail, she had second thoughts about it; she agreed that it did not sound like an objective investigation. She later told her supervisor, Mellor, that she had tried to delete the message right after she left it, but it went through. Plaintiff did not contact Levin or Mellor about the voicemail at the time she sent it.

The next day at around 12:30 p.m., an attorney for SAIF contacted Mellor because he had been contacted by an attorney for Perlo who had concerns about plaintiff's investigation. He then forwarded to both Mellor and plaintiff the email he had received, which mentioned a voicemail. Mellor notified her superior at SAIF, Steven Hogaboam, who is the SAIF Investigations Director, of the situation.

Plaintiff called the attorney for Perlo and predicted that she would be getting fired. The attorney told plaintiff that he did not think he should talk to her and that she needed to contact her supervisor. Plaintiff then contacted Mellor, upset and crying. She told Mellor about the voicemail and was concerned that she was getting fired; she conveyed that it was unprofessional and that she had tried to delete it. Mellor instructed plaintiff not to call anyone until she could look into the matter. Plaintiff acknowledged that she had become too personally involved. In her declaration, plaintiff stated that "I was saying whatever I could so as to not lose my job."

The attorney for Perlo then called Mellor. He expressed concerns about bias in plaintiff's investigation and forwarded the voicemail to Mellor. Mellor shared the voicemail with Hogaboam, who in turn shared it with Celia Feres-Johnson, SAIF's Employee Relations manager. Feres-Johnson found the voicemail to be "very unprofessional"; it appeared to her that plaintiff was trying to coerce a witness. Feres-Johnson asked Hogaboam to place plaintiff on temporary leave and consider taking her off of the investigation because her actions were a serious violation of the code of conduct and behavior that is not tolerated at SAIF. At Hogaboam's direction, Mellor then sent an email to plaintiff instructing her to not have further contact with anyone on the claim, to complete the ROI, and to follow SAIF polices in the future.

Over the next two days, which were on the weekend, plaintiff sent lengthy texts to Mellor's personal cell phone, which Mellor at some point saved into SAIF's system as "supervisor's notes." In sum, on Saturday, plaintiff sent a text to Mellor that began with "Hi, I am going to give you my letter of resignation on Monday before I get fired." The text went on to explain that plaintiff left the voicemail for the witness

because she needed his statement as she believed other witnesses she had talked to were lying. She stated multiple times that leaving the voicemail was "wrong" and "stupid." She also said she truly believed people were lying to her, "[b]ut that is truly grounds for firing me and I get it. I'm not trying to plead innocent, because I am not innocent. I am guilty as charged." Plaintiff said she would finish up her reports and, after taking leave, it would be the "[e]nd of my career at Saif" and also that "I deserve whatever I get. I plead guilty." She then ended the text saying, "Or [m]aybe you could just demote me to a position where I don't talk to injured workers or employers. Like investigations assistant or some bullshit like that."

The next day, on Sunday, Mellor responded by text, "I don't mean to ignore you-I'm just not sure how to respond." Plaintiff responded with two separate texts. The first was shortly after Mellor's text and stated that she understood, that she had retained an attorney, and that she tells herself "'you made your bed, now you have to lie in it.'" The text continued that she thought Perlo was "after BLOOD and BLOOD they will get and they know it." She concluded:

> "Bottom line, this is my fault and I will deal with the consequences. Maybe I will cry a lot, but I will be ok. I am a strong person and very talented. I do a lot of things that no human will ever do. I will be ok NO MATTER WHAT!"

Later that same Sunday, plaintiff sent Mellor a second, much longer text. We repeat the majority of the text here, omitting only references to a different claim, because plaintiff relies on it for the claims that are before us. That text provided:

> "Oh one last text from me and then I will leave you in peace.

> "I am not biased toward employers or injured workers. I am biased toward TRUTH. You know as well as I do, when I feel a worker is lying, I will do everything I can to prove they are lying - as proven in my activity check work and all of my work. I go the extra mile to find the truth about what is going on. I even fuck up trying just too damn hard. \*\*\*

> "I need to just not care at all. That way I won't work so hard in the first place. When I work too hard I start making mistakes. Like this was a mistake leaving this guy a

message when I fucking knew better. I'm not saying it was a mistake like oooops, accident, I'm saying it was a risk I took that I should not have. Hoping to bring the truth to the surface. Hoping to appeal to a person's ethical self to do the right thing. Instead it fucking backfired on me like I should have expected from the pieces of shit working at that jobsite harassing the IW [injured worker]. Harassing him for his accent, for the way he walks, for the way he talks, putting signs on his back that say, 'Fuck me, I'm your bitch.' Lifting up the porta-potty while his is in it. Grabbing his nipples and twisting them over and over again at least 5 times.

"You tell me if that would not make you feel like finding the truth. This is racial discrimination, sexual abuse, verbal abuse. I cannot just sit still and not stand up for that. Ok I did it in the wrong way. I admit it.

"Yes, the injured worker has prior problems with mental issues. He is a victim of human trafficking. We cannot even pretend to know what goes on in his mind and his heart. He should probably not be working at all and much less at a construction jobsite which are breeding grounds for this type of despicable behavior.

"If people would simply be nice to him, treat him with the human decency we all deserve, he would probably be fine. Put him on a job site with a couple of racist rednecks and this is the outcome anyone would expect.

"You tell me why [redacted] only interviewed supervisors and the one person mentioned as the suspect? Why did they not pull everyone from that jobsite who worked around him and talk to them? Why did they only interview people who would tell them what they wanted to hear? And even if they had pulled them all in, they knew they never would have told them the truth for fear of losing their jobs in this crazy difficult COVID-19 time. People have to feed their families. People have to put shelter their families. When you are weighing your family's welfare against telling the truth about a guy at the jobsite getting harassed and losing your job, which would you choose?

"And why did [redacted] do their own investigation biased in their favor? Why? Why did they not let a professional company do it? You see all of these witnesses have been subconsciously manipulated to be ready to say only good things about all of this when I call. Nobody says the

words, but everyone understands. Everyone knows the repercussions surrounding the truth. Everyone understands that their jobs are on the line.

"A person does not just make this shit up. I know this. I know this, because I am a kind, noble, ethical, honest, moral person. I LIVE what I BELIEVE.

"Ok I understand I did it in the wrong way. But, I also did it for the RIGHT REASON.

"SAIF teaches us to be 'professional' and 'conduct ourselves in a professional manner'. But SAIF also teaches us not to accept or condone any kind of harassment or abusive behavior.

"If this were going on at SAIF, would SAIF want to know the truth about what is going on? Even if it meant an investigator from wherever called witnesses and said, 'I believe the witnesses are not telling the truth, I need to know the truth. You may be the only person who can make this right. I believe SAIF is covering up the truth.'

"What is the bottom line here? Is SAIF a company that is willing to sweep harassment, abuse and discrimination under the rug in the name of professionalism from [t]he company investigating the claims of this at SAIF? This is my hypothetical case at SAIF.

"And who in their right mind believes that these fucking rednecks at the jobsite would do any of these things they are accused of when there is a [s]upervisor or foreman around? I mean asking the supervisors about this seems completely ludicrous to me. People do not do horrible things in front of supervisors.

"I cannot sleep with myself at night and wake up with myself in the morning and look at myself in the mirror without doing my best to find the truth.

"I'm sorry I did it in an unprofessional way[.]

"'Integrity is doing the right thing, even when no one is watching.' - C.S. Lewis"

When asked about those texts at her deposition, plaintiff testified that "this is me kind of ranting and raving about how I'm feeling to a friend who is happens to be my supervisor." In her declaration, plaintiff also described the

Saturday text as "basically as a plea to keep my job." Mellor told Hogaboam about the texts, but Hogaboam did not read the texts and did not share the texts with others or mention them in discussions about plaintiff's discipline for the voicemail. Hogaboam testified that he did not learn details about the texts before plaintiff's employment was terminated.

On Monday, July 13, Mellor and Hogaboam spoke with Perlo's labor attorney, Wood, and someone from Perlo's human resources department to obtain their perspective and concerns about plaintiff's investigation. Their concern was that, based on the voicemail and some questions plaintiff had asked Perlo's human resources person, plaintiff was biased, and the bias was tainting the investigation. No one at Perlo suggested that plaintiff's employment should be terminated.

Hogaboam and Feres-Johnson spoke with Kathy Gehring, the Vice President of claims. Gehring has final approval on discipline and termination matters for the claims division, with human resources in a consultation role. They explained the situation about the voicemail, and Feres-Johnson conveyed her belief that plaintiff had lost her objectivity.

Feres-Johnson also suggested to Hogaboam that he should consider a supervisor review of plaintiff's ROI. Hogaboam asked Mellor to tell plaintiff to hold off on submitting the ROI given the concerns about her investigation. Mellor called and told plaintiff to not image the ROI at that time. Plaintiff told Mellor that the report was done and she could email it to her, but Mellor instructed her not to do that because she needed to talk to Hogaboam. Plaintiff stated she would keep the report until Mellor was ready. In her declaration, plaintiff averred that she told Mellor that it was illegal to not image the ROI. Following the conversation, plaintiff emailed Mellor and Hogaboam telling them, among other things, that she had already typed the ROI and was ready to image it when she had permission to do so.

Mellor did not make any note that plaintiff had opined that not submitting the ROI was illegal. Hogaboam did not recall hearing that plaintiff had made such a

statement and did not mention any such statement to Feres-Johnson or Gehring; he averred that it is common for supervisors to instruct investigators to delay an ROI when there are questions of accuracy. After having an opportunity to discuss the situation with counsel, Hogabaom told Mellor to have plaintiff turn in all ROIs. The next day, July 14, at 1:30 p.m., Mellor had a phone meeting with plaintiff and told her to submit her ROI as usual that day. Plaintiff agreed to do so. Mellor also asked about the voicemail and plaintiff said that the voicemail was inappropriate, that she had tried to delete it, and that it resulted from her personal stress, her emotional attachment to the case, and her wanting to get to the truth. The following day, July 15, before plaintiff was terminated, plaintiff requested to send the ROI in later, but Mellor told her to send what she had. Plaintiff sent in the employer statement and witness statements but did not include CR's statement.

On July 14, at about 2:38 p.m., Gehring made the final decision to terminate plaintiff's employment with SAIF based on the recommendations and information from Hogaboam and Feres-Johnson. She concluded, "Based on all of the information presented to me, there was an issue of—that goes into the conduct of not being objective and losing objectivity, which is a key component to the investigator work. So that was the primary reason." She also testified that "it was clear, [plaintiff] had made some conclusions and then pushed for information based on those conclusions versus continuing to objectively collect information."

Hogaboam had recommended to Gehring that plaintiff's employment be terminated "[b]ecause I felt that the contents of the voicemail were egregious enough that that was an appropriate reaction." He thought it was egregious because plaintiff had accused Perlo of covering up what happened and that she needed to prove harassment, which is not the role of SAIF nor the role of a SAIF claim investigator. He testified that "the overall impression of bias in that situation, this sounds to me like an investigator who has lost objectivity about what happened at the workplace and is no longer trying to objectively gather the facts, they're trying to prove a point one way or another." Feres-Johnson

had also recommended termination because the code of conduct violation was so severe and plaintiff's behavior toward the witness was egregious. Neither Hogaboam nor Feres-Johnson spoke to plaintiff or reviewed plaintiff's draft ROI or any witness statements before the final decision to terminate plaintiff's employment.

On July 15 at 3 p.m., Hogaboam, Feres-Johnson, and Mellor spoke with plaintiff by phone. Hogaboam talked about the importance of objectivity and then terminated plaintiff's employment, explaining that the voicemail was an egregious offense. He also told plaintiff to email any notes and the ROI to Mellor by the end of the day. He then asked if she had sent it. Plaintiff responded by making disparaging remarks at Hogaboam and screamed "fuckers" and "bitches," at which point Feres-Johnson ended the call. Plaintiff thought the call had ended before she made those remarks. At some point close in time to plaintiff's termination—either before or after it—Mellor created a document for her own use that detailed her interactions with plaintiff, using her notes to create it.

Plaintiff filed statutory retaliation claims against SAIF, under ORS 659A.030, ORS 659A.199, and ORS 659A.203. SAIF filed a motion for summary judgment on all of plaintiff's claims, asserting that, as a matter of law, plaintiff did not make a good faith report of a violation of law or engage in protected activity and that there was no evidence of causation. In response, plaintiff asserted that she engaged in protected activity, for purposes of ORS 659A.030, by opposing CR's harassment and discrimination in her voicemail and in the July 11 and 12 texts to Mellor; made a report, for purposes of ORS 659A.199, via those same texts; and reported a violation of law, for purposes of ORS 659A.199 and ORS 659A.203, by telling Mellor that it was illegal to tell her to not image the ROI. Plaintiff also asserted that a genuine issue of fact existed on causation.

The trial court granted summary judgment to SAIF on all of plaintiff's claims and entered a limited judgment. In its letter opinion, the court concluded that the voicemail and its contents were not protected activity because plaintiff, by her own admissions, did not intend it to be a report under

ORS 659A, nor was it a report to the employer, and it did not
mention any violations by SAIF. The court concluded that
plaintiff's texts to Mellor did raise an issue of fact whether it
was a good faith report that Perlo was violating the law in its
treatment of CR, but also concluded that the statutes were
not intended to protect that type of report—the conduct of a
company that was not plaintiff's employer or an employee of
plaintiff's employer. The court did not address in its letter
opinion whether plaintiff's comment that not imaging the
ROI was illegal was a report under ORS 659A.199 and ORS
659A.203. The court stated with regard to causation that
"[t]here is a genuine issue of fact in the mind of the Court
as to why Plaintiff was fired and, although very thin, that a
jury could make a finding that complaints to SAIF about the
conduct of Perlo employees was the reason for termination."

Plaintiff appeals from the limited judgment and a
subsequent supplemental judgment granting SAIF costs.

## II.   ANALYSIS

On appeal, plaintiff asserts that the trial court
erred in concluding that she did not engage in protected
activity or make a report as contemplated by the statutes.
SAIF responds in support of the trial court's conclusions, and
also raises a conditional cross-assignment, arguing that the
court erred in concluding that plaintiff's texts constituted
a good faith report under ORS 659A.199 and that plaintiff
raised a genuine issue of fact on causation. Although the
parties combine their arguments for the different statutes,
we separately address each of plaintiff's claims in turn.

A.   *Plaintiff's Retaliation Claim Under ORS 659A.030(1)(f)*

For her ORS 659A.030(1)(f) claim, plaintiff relies on
two of her actions as constituting "protected activity" under
that statute: her voicemail to the witness and her texts to
Mellor. Plaintiff argues that the voicemail and texts qualify
as protected activity because, contrary to the trial court's
conclusions, the statute does not require that the unlaw-
ful conduct being opposed is conduct by the person's own
employer or that it be reported to the person's own employer.
Plaintiff also asserts that the statute does not require oppo-
sition to discrimination to be intended as opposition in order

to be protected. SAIF asserts that those actions were not protected activity and, in its cross-assignment of error, asserts that plaintiff did not raise an issue of material fact showing a causal link between her texts to Mellor and her termination. For the reasons explained below, we conclude that the trial court did not err in dismissing plaintiff's ORS 659A.030(1)(f) claim.

ORS 659A.030(1)(f) provides:

"(1)   It is an unlawful employment practice:

"* * * * *

"(f)   For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

An "unlawful practice" is defined by statute as "any unlawful employment practice or any other practice specifically denominated as an unlawful practice in this chapter." ORS 659A.001(14). An unlawful practice includes race-based discrimination in the workplace. *See* ORS 659A.030(1)(b) ("It is an unlawful employment practice * * * [f]or an employer, because of an individual's race * * * to discriminate against the individual in compensation or in terms, conditions or privileges of employment.").

The Supreme Court has explained that "we understand section (1)(f) to assist the protective purposes of ORS chapter 659A by ensuring that any person who is engaged in protected conduct, such as opposing discriminatory practices or seeking redress in an agency or court, is not discouraged from doing so by the threat of being subjected to adverse, disparate treatment." *PSU Association of University Professors v. PSU*, 352 Or 697, 710, 291 P3d 658 (2012). The court concluded that, similarly to the federal antiretaliation provision of Title VII, 42 USC section 2000e-3(a), "subsection (1)(f) is composed of protections for a broad array of activities linked to asserting or defending the rights of employees to seek relief from unlawful discrimination." *Id.* at 713. From that discussion, we understand that

a protected activity must have some intended connection to the purpose of the statute—that is, it must be an activity linked to defending, in some manner, the rights afforded in ORS chapter 659A. Thus, we reject plaintiff's argument that ORS 659A.030(1)(f) does not require the person to have any intention to oppose an unlawful practice through their conduct for that conduct to be a protected activity.

In addition, with respect to opposing unlawful *employment* practices, such as at issue here, federal case law provides additional guidance. *See PSU Association*, 352 Or at 711 (stating that "federal precedent interpreting the antidiscrimination provisions of Title VII can provide useful additional context to aid our analysis of the meaning of ORS 659A.030(1)(f)"). That case law has long provided that "[t]he employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to *some* practice by the employer that is allegedly unlawful." *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F2d 1008, 1013 (9th Cir 1983) (emphasis in original); *see also, e.g.*, *Maner v. Dignity Health*, 9 F4th 1114, 1127 (9th Cir 2021), *cert den*, 142 S Ct 899 (2022) (referring favorably to standards established in *Crown Zellerbach*).

Here, we first conclude that plaintiff's voicemail is not a protected activity under ORS 659A.030(1)(f) in light of those standards. In so concluding, we assume, without deciding, that protected activity can encompass opposition to an unlawful employment practice of an employer other than your own employer.

It is undisputed that plaintiff left the voicemail for a former employee of Perlo, expressing her opinion that CR had been harassed at Perlo and that people were lying about it, in an attempt to get the former employee to talk to her in the course of her investigation of the facts for CR's workers' compensation claim. Plaintiff immediately tried to delete the voicemail. She repeatedly stated that leaving the voicemail was "stupid," "wrong," and "unprofessional" and that it was grounds for SAIF to fire her. We have not located any evidence in the summary judgment record that raises a genuine issue of material fact that plaintiff was intending to assert or defend CR's rights under ORS 659A by leaving

the voicemail for the potential witness. And, plaintiff has not identified any evidence in the summary judgment record that she contends raises a genuine issue of fact on that issue; rather, she asserts only that an intent to oppose an unlawful practice is not required. Thus, on this record and based on plaintiff's arguments, we conclude that plaintiff's voicemail to the witness does not constitute protected activity under ORS 659A.030(1)(f).

We next examine the texts that plaintiff sent to Mellor over the weekend of July 11 and 12. As an initial matter, plaintiff's Saturday text and the first text she sent on Sunday unequivocally do not qualify as protected activity, as neither text identifies "some practice" of Perlo or SAIF that is alleged to be unlawful under ORS chapter 659A. The second text on Sunday does include statements that refer to "some practice" by Perlo that could be understood to be unlawful under ORS chapter 659A, although most of the text does not. The statements that could potentially fall within protected activity provide:

> "Harassing him for his accent, for the way he walks, for the way he talks, putting signs on his back that say, 'Fuck me, I'm your bitch.' Lifting up the porta-potty while he is in it. Grabbing his nipples and twisting them over and over again at least 5 times.

> "You tell me if that would not make you feel like finding the truth. This is racial discrimination, sexual abuse, verbal abuse. I cannot just sit still and not stand up for that."

However, even if that portion of the text identifies some allegedly unlawful employment practice, and does qualify as a protected activity, we nonetheless affirm the trial court's dismissal of plaintiff's ORS 659A.030 claim based on SAIF's cross-assignment of error on causation.

As part of a *prima facie* case under ORS 659A.030 (1)(f), a plaintiff has to show a causal link between the protected activity and the adverse employment action in the same manner as under the whistleblowing statute, ORS 659A.199. *See Lacasse v. Owen*, 278 Or App 24, 32, 373 P3d 1178 (2016) (stating that causation under ORS 659A.030(1)(f) requires proof "that defendant's unlawful motive was a substantial factor in [the plaintiff's] termination, or, in other

words, that [the plaintiff] would have been treated differently in the absence of the unlawful motive"); *see also Ossanna v. Nike, Inc.*, 365 Or 196, 209, 445 P3d 281 (2019) (discussing "cat's paw" theory of causation and concluding it applies to both retaliation and whistleblowing claims). For the same reasons explained below on plaintiff's ORS 659A.199 claim, we conclude that plaintiff failed to raise a genuine issue of material fact on causation between the texts to Mellor and her termination for her ORS 659A.030(1)(f) claim.

As a result, the trial court did not err in granting summary judgment to SAIF on plaintiff's ORS 659A.030 claim.

B.  *Plaintiff's Whistleblowing Claim Under ORS 659A.199(1)*

Plaintiff relies on three of her actions to support her whistleblowing claim under ORS 659A.199(1): the voicemail to the witness, her texts to Mellor, and her telling Mellor that it was "illegal" to tell her not to image her ROI. Plaintiff argues that, contrary to the trial court's conclusion, it is not necessary for an ORS 659A.199 report to be about the employee's employer and that the trial court erred in failing to consider her claim based on the comment about submission of the ROI. In its cross-assignment of error, SAIF argues that, if the trial court erred as argued by plaintiff, the trial court also erred in concluding that plaintiff made a "good faith" report by her texts to Mellor and erred in concluding that plaintiff presented evidence of causation. As explained below, we conclude that the trial court did not err in granting summary judgment to SAIF, because we conclude, on SAIF's cross-assignment of error, that plaintiff did not present *prima facie* evidence of causation with regard to the texts. We also conclude that plaintiff telling Mellor it was "illegal" to not image the ROI was not a good faith report under ORS 659A.199.

ORS 659A.199(1) provides:

"It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee *** for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."

That statute requires "a subjective, good-faith belief that the reported information is evidence of unlawful activity." *Folz v. ODOT*, 287 Or App 667, 673, 404 P3d 1036 (2017), *rev den*, 362 Or 482 (2018); *see also Hall v. State of Oregon*, 274 Or App 445, 453, 366 P3d 345 (2015) (comparing the subjective good faith standard in ORS 659A.199 and ORS 659A.233 with the objective reasonableness standard in ORS 659A.230). "[A]n employee has engaged in protected activity under [ORS 659A.199] if the employee has reported information that he or she subjectively believes is a violation of a state or federal law, rule, or regulation and has a good faith basis for that belief." *Boyd v. Legacy Health*, 318 Or App 87, 98-99, 507 P3d 715 (2022). What constitutes a "report" under ORS 659A.199 is synonymous with "disclosure," which we have identified as meaning "'to make known' or to 'open up to general knowledge.'" *McClusky v. City of North Bend*, 332 Or App 1, 11-12, 549 P3d 557 (2024) (discussing and synthesizing *Bjurstrom v. Oregon Lottery*, 202 Or App 162, 120 P3d 1235 (2005), and *Folz*). A good faith report requires a plaintiff to articulate facts from which a reasonable fact-finder could conclude that the plaintiff subjectively believed that the conduct violated state law and that the plaintiff had a good faith basis in fact and law for that belief. *McClusky*, 332 Or App at 14. "Whether an employee held a subjective good faith belief regarding a violation of law at the time of the report is a question of fact." *Id*.

As an initial matter, we agree with plaintiff that the trial court erred to the extent that it concluded that a good faith report under ORS 659A.199 must be about the employee's employer. We stated in *McClusky* that "ORS 659A.199 is not limited to reported violations about the employer." 332 Or App at 16. Rather, we identified the limiting principle for the application of the statute was that "ORS 659A.199 does require that the employer's adverse employment action be taken 'because' of or 'for the reason that' the employee reported the violation of law." *Id*. We next turn to the three distinct reports identified by plaintiff.

We conclude with respect to the voicemail that, as a matter of law, it does not constitute "reported information that the employee believes is evidence of a violation of

a state or federal law, rule or regulation." ORS 659A.199(1). Our conclusion is based on the same reasons discussed above with respect to ORS 659A.030(1)(f), particularly that there is no genuine of issue of material fact that plaintiff sought to report anything by leaving the voicemail.

With respect to plaintiff's texts to Mellor, however, we conclude that plaintiff has raised a genuine issue of material fact that they constitute a good faith report of a violation of law for purposes of ORS 659A.199. In plaintiff's second Sunday text to Mellor she reported that, based on the facts she provided in the text, she believed CR was subject to racial discrimination and abuse at Perlo. In so concluding, we reject SAIF's argument that it was not a *good faith* report. SAIF asserts that the report was not in good faith because plaintiff's motive for the texts was to rant to a friend and "basically as a plea to save my job." At the summary judgment stage, plaintiff does not need evidence that she was purely motivated by a desire to disclose unlawful behavior; she only needs to produce evidence from which a jury could make the necessary good faith finding. Here, the jury could reasonably infer plaintiff's good faith based on her sharing facts with Mellor that formed the basis for her belief that CR had experienced racial discrimination, sexual abuse, and verbal abuse on the jobsite and based on her expressed desire to stand up for what she believed was true.

Although we conclude that the Sunday text raised a genuine issue of fact on whether it was a good faith report, we agree with SAIF that plaintiff failed to present evidence of a causal link between that text and her termination from SAIF. As part of her *prima facie* case under ORS 659A.199, plaintiff had to show that "the employer's adverse employment action [was] taken 'because' of or 'for the reason that' the employee reported a violation of law." *McClusky*, 332 Or App at 16 (quoting *Ossanna v. Nike, Inc.*, 290 Or App 16, 26-27, 415 P3d 55 (2018), *aff'd*, 365 Or 196 445 P3d 281 (2019)). The necessary causal link can be shown through a "cat's paw" or imputed motive theory, where the alleged bias of a supervisor may be considered a cause of termination because the supervisor held influence over the adverse employment decision. *See McClusky*, 332 Or App

at 20-21 (discussing theory). "But imputation of bias works only to permit a factfinder to impute a supervisor's bias to a defendant employer. To prove the employer's liability for an unlawful employment practice, a plaintiff must also demonstrate the requisite causation—that the supervisor's unlawful bias caused the adverse employment action." *Ossanna*, 365 Or at 210.

Here, plaintiff argues that she created a genuine issue of material fact on causation because only a few days elapsed between her text and her termination and a jury could reasonably infer that Hogaboam knew from Mellor about plaintiff's report of Perlo's unlawful treatment of CR. Plaintiff asserts that causation is established by evidence that Hogaboam, who was aware of plaintiff's report, directly influenced the decision to terminate her employment, because he recommended termination to Gehring and Gehring relied on his and Feres-Johnson's recommendations. Plaintiff argues that it is for the jury to decide whether Hogaboam was biased against plaintiff because of her report and whether the bias can be imputed to SAIF.

In our view, the chain of causation advocated by plaintiff is not supported in the summary judgment record. Viewing the evidence in the light most favorable to plaintiff, the summary judgment record supports a finding that Mellor told Hogaboam about plaintiff's texts over the weekend. Hogaboam denied knowing any details about the texts, but the record could support a reasonable inference that Mellor informed Hogaboam of plaintiff's report of Perlo's unlawful conduct in the Sunday text. However, there is no evidence from which a reasonable factfinder could find that Hogaboam conveyed any information about plaintiff's texts—either that they existed or the content of them—to either Feres-Johnson or Gehring. It is undisputed that Hogaboam gave his recommendation to Gehring to terminate plaintiff based on his stated reason of the egregious nature of the voicemail. It is undisputed that Feres-Johnson based her recommendation to Gehring to terminate plaintiff based on the voicemail constituting a serious violation of SAIF's code of conduct and demonstrating a loss of investigator objectivity, and that she did not know anything about

the claim plaintiff was investigating. It is also undisputed that Gehring based her decision to terminate plaintiff on the information about the voicemail conveyed to her by Feres-Johnson and Hogaboam.

Where the summary judgment record fails plaintiff is that it lacks any evidence from which a reasonable factfinder could conclude that Hogaboam held an unlawful bias that played a substantial factor in plaintiff's termination from SAIF's employment. The timing alone between the report and plaintiff's termination, which is all that plaintiff has, is not sufficient to raise a genuine issue of causation on this record because timing alone can only suffice, at most, to impute bias to Hogaboam. *See Boyd*, 318 Or App at 104-06 (discussing cat's paw theory and temporal proximity). Plaintiff has not pointed to anything in the record that establishes a *prima facie* causal link between that imputed bias and Gehring's decision to terminate plaintiff. Gehring decided to terminate plaintiff's employment based on the recommendation of both Hogaboam and Feres-Johnson. There is no evidence from which a reasonable factfinder could infer that Feres-Johnson held an unlawful bias based on plaintiff's report or that she was influenced by any unlawful bias of Hogaboam; Feres-Johnson had already concluded by Friday, July 10, that plaintiff's conduct was a serious breach of the code of conduct that is not tolerated at SAIF and had recommended to Hogaboam to put plaintiff on temporary leave, although he did not do that. Before plaintiff made the report, plaintiff herself expressed her understanding several times that the voicemail she left was sufficient grounds to terminate her employment. In the circumstances of this case, where plaintiff can only point to timing and there is no other evidence that Hogaboam held an unlawful bias that influenced the adverse employment action, plaintiff asks for tenuous inferences that the summary judgment record cannot support to meet the necessary chain of causation.

Finally, with regard to plaintiff's comment to Mellor about submission of the ROI, we conclude that it does not constitute a good faith report of a violation of law under ORS 659A.199. As stated above, a good faith report requires a plaintiff to articulate facts from which a reasonable

factfinder could conclude that the plaintiff subjectively believed that the conduct violated state law and that the plaintiff had a good faith basis in fact and law for that belief. *McClusky*, 332 Or App at 14.

Here, plaintiff has made no effort to meet that standard. The only evidence in the summary judgment record was that plaintiff learned from SAIF that ROIs were legal documents that must be imaged to the claim file. Nothing about that belief suggests that not imaging an ROI to a file, or a supervisor telling an investigator to not image an ROI to a file, is illegal. Plaintiff has not articulated any basis in fact or law to create a genuine issue of material fact that she, in good faith, subjectively believed that Mellor telling her to not image the ROI was illegal, and we will not endeavor to do it for her.

As a result, we conclude that the trial court did not err in granting summary judgment to SAIF on plaintiff's ORS 659A.199 claim.

C.  *Plaintiff's Whistleblowing Claim Under ORS 659A.203*

On appeal, plaintiff bases her whistleblowing claim under ORS 659A.203 solely on the comment she made to Mellor about submission of the ROI. For the same reasons expressed above, we reject her arguments.

ORS 659A.203(1)(b)(A) provides:

"[I]t is an unlawful employment practice for any public or nonprofit employer to:

"* * * * *

"(b)   Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"(A)   A violation of any federal, state or local law, rule or regulation by the public or nonprofit employer[.]"

ORS 659A.203 "requires an objectively reasonable belief that the public entity has engaged in unlawful conduct." *Folz*, 287 Or App at 673.

We conclude that plaintiff's comment about submission of the ROI was not an activity that entitled her to protection under ORS 659A.203(1)(b)(A). Plaintiff has not articulated any basis to support that that statement was "an objectively reasonable belief" that SAIF had engaged in unlawful conduct. The trial court did not err in granting summary judgment to SAIF on her ORS 659A.203 claim.

Affirmed.